[Civ. No. 54678. Second Dist., Div. Four. Aug. 28, 1979.]

JOYCE CALLAHAN POWERS, Plaintiff and Respondent, v. DAVID H. FOX, as Real Estate Commissioner, etc., Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, Arthur C. de Goede, Assistant Attorney General, and Susan A. Myers, Deputy Attorney General, for Defendant and Appellant.

Siple & Orrock, Randolph E. Siple and Terry Kingstein for Plaintiff and Respondent.

OPINION

**KINGSLEY, J.**—The Real Estate Commissioner appeals from an order directing him to pay to respondent the sum of $25,956 from the Real Estate Recovery Fund. Admittedly, respondent was defrauded of $55,000 by the machinations of Mr. Powers; the sole question before this court is whether she is entitled, under sections 10471 and 10472 of the Business and Professions Code, to the sum so awarded. We conclude that she is not and reverse the order appealed from.

The applicable sections read as follows: Section 10471: "When any aggrieved person obtains a final judgment in any court of competent jurisdiction against any person or persons licensed under this part, under grounds of fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any transaction when the judgment debtor was licensed and performed acts for which a license is required under this part, and which cause of action occurred on or after July 1, 1964, the aggrieved person may, upon the judgment becoming final, file a verified application in the court in which the judgment was entered for an order directing payment out of the separate account in the Real Estate Fund for education, research, and recovery purposes of the amount of actual and direct loss in such transaction up to the sum of ten thousand dollars ($10,000) of the amount unpaid upon the judgment, provided that nothing shall be construed to obligate such separate account for more than ten thousand dollars ($10,000) per transaction regardless of the number of persons aggrieved or parcels of real estate involved in such transaction.

"In the case of a small claims court judgment, the aggrieved person shall file the verified application in the justice or municipal court in which the judgment was entered in favor of the aggrieved person. Such

court shall then make a determination as to whether the small claims court judgment was based on facts constituting grounds for recovery under this section and may enter an order directing payment of such small claims court judgment out of the separate account in the Real Estate Fund for education, research, and recovery purposes.

"A copy of the verified application shall be served upon the commissioner and the judgment debtor and a certificate or affidavit of such service filed with the court."

Section 10472: "The court shall conduct a hearing upon such application 30 days after service of the application upon the Real Estate Commissioner. Upon petition of the Real Estate Commissioner, the court shall continue the hearing up to 60 days further; and upon a showing of good cause may continue the hearing for such further period as the court deems appropriate. At the hearing the aggrieved person shall be required to show:

"(a) He is not a spouse of debtor, or the personal representative of such spouse.

"(b) He has complied with all the requirements of this article.

"(c) He has obtained a judgment as set out in Section 10471, stating the amount thereof and the amount owing thereon at the date of the application.

"(d) He has made all reasonable searches and inquiries to ascertain whether the judgment debtor is possessed of real or personal property or other assets, liable to be sold or applied in satisfaction of the judgment.

"(e) That by such search he has discovered no personal or real property or other assets liable to be sold or applied, or that he has discovered certain of them, describing them, owned by the judgment debtor and liable to be so applied, and that he has taken all necessary action and proceedings for the realization thereof, and that the amount thereby realized was insufficient to satisfy the judgment, stating the amount so realized and the balance remaining due on the judgment after application of the amount realized.

"(f) That he has diligently pursued his remedies against all the judgment debtors and all other persons liable to him in the transaction

for which he seeks recovery from the separate account in the Real Estate Fund for education, research, and recovery purposes.

"(g) That he is making said application no more than one year after the judgment becomes final."

The facts are not seriously in dispute. Early in 1975 respondent (hereinafter Hill) met Mr. Powers. He was then working for two licensed real estate brokers but was not then licensed himself, although he represented himself to Hill as being licensed. Powers suggested to Hill that she borrow against some real property owned by her and invest the proceeds in a property in Ojai known as the Gaslight Restaurant. Hill agreed and borrowed $40,000. Of that amount, $17,500 was used to secure a check in favor of the owners of the restaurant; the balance, approximately $18,000, was placed in a joint checking account, under the name of Afincar, on which both Hill and Powers had the right of withdrawal. The Afincar account was purportedly to be used as operating capital for the restaurant. The restaurant was never purchased; Powers forged the indorsement of the payees of the $17,500 check and used the funds for his own purposes; he withdrew the money from the Afincar account and used it for his own purposes. Thereafter, Powers told Hill that he had sold the restaurant at a profit and invested the proceeds in real property near Lake Tahoe. In that connection, Powers falsely told Hill that, in addition to the Gaslight proceeds he had invested money of his own, secured by borrowing against a trust fund set up for him by his mother. All of the representations about buying Tahoe property were false.

Shortly after the alleged purchase of the Gaslight Restaurant, Powers told Hill that he had invested $6,000 of his own money in a condominium but stood to lose that investment unless he could raise an additional $11,000. At Powers' request, both parties, on a joint note, borrowed $15,000 from a bank. Of that money, $11,000 went to purchase the condominium; $4,000 was converted to Powers. Although Powers had told Hill that title to the condominium would be taken in their joint names, he caused title to be in his name only.

Powers and Hill were married on June 28, 1975; on August 11, 1975, Hill petitioned for a decree of nullity based on fraud (Civ. Code, § 4425) and a decree of nullity was entered in that suit on January 30, 1976. The court in the nullity action reserved jurisdiction over Hill's property claims and, ultimately, made and entered a "Judgment re Property" in which it found that Powers had defrauded Hill of the $55,000; it purported to

settle title to the condominium in Hill and ordered Powers to pay to Hill $15,000 as punitive damages.[1]

In the interim, Powers had been convicted of forgery and grand theft, based on the transactions above set forth.

The Real Estate Commissioner here attacks the order requiring him to pay out of the fund, on a number of grounds, which we proceed to discuss:

### I

■ Under subdivision (a) of section 10472, there can be no recovery from the fund by "spouse" of a real estate agent. Part of Powers' conduct took place between the date of his marriage to Hill and the decree of nullity. While it is true that, for some purposes, a decree of nullity of a voidable marriage "relates back" to the date of the voided marriage,[2] that doctrine is not without exceptions. One such exception, is here applicable. In *Interinsurance Exchange* v. *Velji* (1975) 44 Cal.App.3d 310 [118 Cal.Rptr. 596], this court said (at pp. 316-317): "When the rights of third parties are involved, as here, the courts should be especially wary in applying the fiction of relation back. It would be most artificial to apply the concept here, in a manner injurious to the rights of respondent as an innocent party and we decline to do so." As the cases applying the sections here before us have pointed out, the theory of the statute setting up the fund is that a citizen has relied, to his damage, on the implied representation, inherent in the fact of licensure, that the licensee is honest and dependable. The obvious reason for the exception set forth in subdivision (a) of section 10472 is that, where the victim and the fraudulent actor are married, the reliance is more likely based on the marital relationship with the trust therein involved than on the license. That reliance on the personal relation is as real in the case of a voidable

---

[1]In light of the conclusions we reach as to the applicability of the statutory provisions to the facts herein involved, we need not, and do not determine whether the "Judgment re Property," entered in the annulment action, is the kind of judgment referred to in section 10471.

[2]See 6 Witkin, Summary of California Law (8th ed. 1974) Husband and Wife, section 40, pages 4910-4911.

Hill here relies on *Clark* v. *City of Los Angeles* (1960) 187 Cal.App.2d 792 [9 Cal.Rptr. 913], and *Cottam* v. *City of Los Angeles* (1960) 184 Cal.App.2d 523 [7 Cal.Rptr. 734, 85 A.L.R.2d 238], which involved public pensions. Those cases rested on the theory that no intervening rights had created any estoppel—cf. *Sefton* v. *Sefton* (1955) 45 Cal.2d 872, 876-878 [291 P.2d 439]. The cases so relied on are not here helpful for the reasons set forth in the text.

marriage (at least until action is filed)[3] as it is in the case of a valid marriage. It follows that, insofar as liability of the fund is based on frauds committed between June 28, 1975, and August 11, 1975, recovery is barred by the provision hereinabove referred to.

The condominium transaction falls within that limitation. The condominium loan was made on July 15, 1975, two weeks after the marriage. $11,000 was invested in the condominium on July 17, 1975; the $4,000 balance was converted by Powers between July 15th and July 24th—well before August 11th.

## II

Section 10471 provides for recovery only for a "transaction" for which a license is required. While the parties are in disagreement over the number of transactions herein involved, we conclude that there were only two: (1) the Gaslight deal, including the Afincar embezzlement, and the Tahoe misrepresentation; and (2) the condominium transaction.

(A) The Gaslight transaction started with securing from Hill of $40,000, split, according to the agreement between Hill and Powers, into two checks—one for $17,500 which Powers immediately converted, and one for $18,000 which Powers placed in the Afincar account and then proceeded to embezzle. The Tahoe embezzlement was no more than a second step in that same scheme, designed to keep Hill from discovering that the restaurant had never been purchased as Powers had represented.

That transaction, so defined, does not fall within the ambit of section 10471. As the record shows, that transaction was represented to be a joint enterprise, into which both Hill and Powers were to invest. But a transaction is not one "for which a license is required" as section 10471 requires, even though one of the coadventurers happens to hold a broker's license.

(B) The condominium transaction also is without the statute. It, also, was a joint enterprise, into which both Hill and Powers invested; not one for which a broker's license was required.

---

[3]We need not here determine whether the statutory restriction would apply to a transaction having its origin after an annulment proceeding relying on fraudulent conduct had been filed.

## III

Section 10471 provides for recovery only for a "transaction" while the defendant was licensed. The original representations which led up to the Gaslight fraud were begun in March of 1975; the $40,000 loan was secured on March 6, 1975; the forgery of the $17,500 check took place on March 7, 1975; the embezzlement of the Afincar account took place over a period beginning March 7, 1975, and ending on August 1, 1975. The Tahoe misrepresentation took place on April 21, 1975.

Powers was first licensed as a real estate salesman on March 20, 1975; that license was "suspended" for falsities in the application on May 5, 1975; it was reinstated, in a restricted form, on July 11, 1975, the reinstatement to be effective on August 5, 1975; it remained in effect during the period thereafter involved in this case.

It is thus apparent that, of the various events above described, part of the embezzlement of the Afincar account took place while Powers' license was in effect and the Tahoe misrepresentation also took place during that period. The other events either preceded Powers' licensing or took place during the period of its suspension.

(a) ■ Hill argues, and the trial court appears to have agreed, that Powers should be treated as a licensee even though not possessing a valid and operative license, because he had led her to believe that he held a license. We reject that contention. While such a misrepresentation may have been part of Hill's recognized claim that she was defrauded by Powers, the statute on which she here relies does not permit recovery from the fund for every real estate fraud. It is designed as part of the overall licensing scheme and it applies only to fraud committed by a licensee.

(b) ■ The briefs discuss at length the meaning of the word "transaction" as used in section 10471. We conclude, following *Dombalian* v. *Fox* (1979) 88 Cal.App.3d 763 [152 Cal.Rptr. 86], that that term refers to the obtaining from the victim money or property by fraud, even though that obtaining is accomplished or covered up by a series of acts. It does not encompass several distinct frauds, relating to independent pieces of property, even though they are all part of a common scheme to mulct a single victim by successive frauds.

The Gaslight fraud was, in essence, committed in March of 1975, well before Powers was licensed. It was then that Powers' misrepresentations that the restaurant was to be purchased for the joint account of Hill and Powers were made and acted on. The fact that Powers did not secure the full benefit of his fraud until after he received his license is immaterial. Powers had secured full control over Hill's $40,000 at a time when he was unlicensed.

Since neither of the two transactions falls within the limits of the statutes, recovery by Hill from the fund is unwarranted. The judgment is reversed.

Files, P. J., and Alarcon, J., concurred.

A petition for a rehearing was denied September 18, 1979.