[No. AO19473. First Dist., Div. Five. Sept. 26, 1983.]

ARCHIE BOOTH et al., Plaintiffs and Respondents, v.
MILDRED B. ROBINSON et al., Defendants and Appellants.

COUNSEL

John K. Van de Kamp, Attorney General, and Julian O. Standen, Deputy Attorney General, for Defendants and Appellants.

Richard G. Maul and Varty & Maul for Plaintiffs and Respondents.

OPINION

**LOW, P. J.**—We hold that when a licensed real estate broker defrauds a person in a transaction during the course of assuming to act as a broker,

the aggrieved person may, upon obtaining an unsatisfied final judgment, recover from the Real Estate Fund.

Mildred B. Robinson (Robinson), a then licensed real estate broker, fraudulently solicited a total of $18,500 from Archie and Dorothea Booth in two transactions. The Commissioner of Real Estate (Commissioner) appeals from an order directing payment out of the Real Estate Fund (Fund) pursuant to Business and Professions Code section 10470 et seq.[1] We affirm.

Section 10471 provided: "When any aggrieved person obtains a final judgment in any court of competent jurisdiction against any person or persons licensed under this part, under grounds of fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any transaction when the judgment debtor was licensed and performed acts for which a license is required under this part, and which cause of action occurred on or after July 1, 1964, the aggrieved person may, upon the judgment becoming final, file a verified application in the court in which the judgment was entered for an order directing payment out of the separate account in the Real Estate Fund for education, research, and recovery purposes . . . ."[2]

In January 1979 plaintiffs commenced a fraud action against Robinson seeking damages in connection with the two transactions in question. Robinson defaulted in the action and on March 8, 1979, plaintiffs obtained a default judgment against her for $17,780 plus interest and costs ($14,280 for a February 1978 transaction and $3,500 for a July 1978 transaction). Having failed to obtain satisfaction of any part of the judgment, plaintiffs filed an application on December 7, 1979, under section 10471, for an order directing payment of their losses out of the Fund.

The Commissioner opposed the application pursuant to section 10473. The parties stipulated that plaintiffs met all requirements for recovery from the Fund except the requirement of section 10471, that the application be based upon a judgment which arose "directly out of any transaction when the judgment debtor was licensed and performed acts for which a license is required under this part [part I, Licensing of Persons, §§ 10000-10602]."

At the hearing on the application, Mr. Booth was the only witness. He testified that he was 67 years old with a sixth grade education, and that his wife was 69 and had finished high school. They had known Robinson for several years and knew that she was a licensed real estate broker. She had

---

[1] All statutory references hereafter are to the Business and Professions Code.

[2] This section was subsequently amended to designate the portion containing the above language subdivision (a) and to add a subdivision (b), which is not relevant to this appeal.

sold a duplex for them in 1974 and helped them find the next house they bought. They later listed that house for sale with her, but it did not sell during the listing. Subsequently, it was sold by another real estate company.

Robinson's license was revoked effective March 19, 1980, by a decision of the Department of Real Estate. The conduct giving rise to the revocation order involved the same property as the July 1978 transaction with the Booths, but involved different victims. The court below took judicial notice of the revocation decision.

Robinson approached the Booths and told them that she would show them how to save money by putting their money in real estate. Mr. Booth stated that "she was going to put it in real estate for us," in "Allstate Real Estate," and that she "told us what the percentage was, that you put $15,000.00 in and get a hundred and fifty dollars every month." When asked if Robinson had said anything else before she presented him with any documents and before he gave her any money, Mr. Booth replied, "Well, this is what she said: If we let her handle the money we wouldn't have to pay no taxes, it wouldn't cost us no taxes, we would get this money clear, a hundred and fifty dollars per month, and at the end of three years we could get this money down; if we wanted to we could let it go on further."

Thereafter, the Booths gave Robinson a cashier's check for $15,000 and they and Robinson executed a document which provided as follows:

"We, Archie L. Booth and Dorothea W. Booth, husband and wife, enter this agreement with Mildred B. Robinson of M. B. Robinson & Co., a real estate company for $15,000, fifteen thousand dollars, effective 14 February 1978, for the period of three years ending 14 February 1981, at the rate of 1% per month interest.

"Said proceeds are to be invested in real estate properties, and Mildred B. Robinson will be the responsible party in controlling the funds, paying the monthly interest, and returning the proceeds upon due date.

"Said monthly interest will become due on the first day of each month and shall be considered delinquent after the fifteenth day of each month, at with [sic] time a .1% (one-tenth percent) late charge of $15.00 will be due."

A copy of the document and check were admitted into evidence and then the following testimony took place:

"Q: Did Mrs. Robinson tell you at all how these Allstate properties operated?

"A: Well, she did explain, said, 'If you put money in real estate for three years you could draw like a hundred and fifty a month clear money with no taxes,' if she—if we let her handle it.

"Q: All right. Did she say what she was going to do with the money?

"A: That is all she said, she was going to put it in the real estate property.

"Q: Did she say she was going to give it to Allstate?

"A: Well, she did that. That's where she was going to put it in real estate, with Allstate."

Mr. Booth also testified that Robinson did not describe to him the manner in which the money was going to be placed in the real properties, and that he had no independent understanding of how the money might be dealt with. He received only a few payments from Robinson, totalling $720.

In July 1978 Robinson again approached the Booths and solicited $3,500 from them. Mr. Booth described this transaction as follows:

"Q: What was the $3,500.00 to be used for?

"A: It was used—this is what she told me, that she had a house on Jackson Street that she needed $4,000.00 to take it over into her name, and if I had $4,000.00 to give her that I could double my money when the house was sold.

"Q: Did she say that she actually owned the house at that time?

"A: Well, at that time she needed this money to get possession of it.

"Q: Did you know the person that owned the house?

"A: No, I didn't."

A note handwritten by Robinson at the time of this transaction was admitted into evidence and provided as follows: "[¶] July 26, 1978. [¶] Received from Archie and Dorothea Booth $3,500.00 on the $4,000.00 applied to the reinstatement and selling of the property at 716 So. Jackson. The estimated return will be $8,000.00 on the investment. [¶] Mildred B. Robinson."

The Booths never saw Robinson again, although they tried to locate her. Mr. Booth went by the Jackson Street house and found it locked and empty

with a sign on it saying, "For Sale, Mildred B. Robinson." None of the $3,500 was returned to the Booths. The total of $18,500 which they had given to Robinson constituted their entire life savings.

Mr. Booth also testified that he believed Robinson was going to make the investments that she told him she was going to make, that he trusted her and that he had relied upon what she said in giving her the money.

On cross-examination Mr. Booth testified that as to the $15,000, Robinson had not said how she was going to get anything out of that, and as to the $3,500, he believed that she was going to make something, but she hadn't told him how much. With respect to the few payments he received from Robinson, "she said it was coming from the real estate where she put it for the investment."

On September 16, 1982, the trial court granted plaintiffs' application and awarded them $10,000 as to the first transaction (the limit of recovery for one transaction) and $3,500 plus interest as to the second transaction, and their costs. No findings were requested or made.

■ A judgment or order of the superior court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent and error must be affirmatively shown. (*Walling* v. *Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].) ■ Where findings are waived or otherwise not specifically made it is presumed that the court made such implied findings as will support the judgment. (*Hall* v. *Municipal Court* (1974) 10 Cal.3d 641, 643 [111 Cal.Rptr. 721, 517 P.2d 1185]; *Stewart* v. *Langer* (1935) 9 Cal.App.2d 60, 61 [48 P.2d 758].) ■ This court must consider the evidence in the light most favorable to the prevailing party giving him every reasonable inference and resolving conflicts in support of the judgment. We look only at the evidence to support the judgment and disregard the contrary showing.

■ Even where there is no conflict in the evidence, if the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment. (*McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].) When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].) ■ The question is whether there is any substantial evidence which will support the conclusion reached by the court below. (*Ibid.*) We determine that the conclusion of the trial court, that Robinson performed acts for which a real estate license was required, is supported by substantial evidence.

The Commissioner contends that the judgment is not protected by the substantial evidence rule because construction of the two documents executed in connection with the transactions is a question of law since there was no conflict between the documents and the evidence presented by Mr. Booth, citing *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839] and *Estate of Platt* (1942) 21 Cal.2d 343 [131 P.2d 825]. In those cases, the issues were the interpretation of the rights of parties under a contract and a testamentary trust, respectively, so that the purposes of the instruments could be given effect. Here, the issue is not the rights of parties under the documents. Robinson procured the documents by fraud and obviously had no intention of performing in conformance with the expectations of the Booths. The issue here involves acts Robinson performed in the course of the transactions, not the interpretation of the fraudulently procured documents.

■ Section 10471 is a remedial statute. It is intended to protect the public against loss resulting from misrepresentation and a breach of fiduciary duty by real estate brokers who are unable to respond to damage awards. It is to be given a liberal construction. (*Nordahl* v. *Department of Real Estate* (1975) 48 Cal.App.3d 657, 663 [121 Cal.Rptr. 794]; accord *Antonio* v. *Hempel* (1977) 71 Cal.App.3d 128, 130 [139 Cal.Rptr. 309].) ■ Remedial statutes are to be construed to promote their purposes and protect persons within their purview. Relief will be granted unless clearly forbidden by statute. (See *Nordahl* v. *Department of Real Estate, supra,* 48 Cal.App.3d at p. 663, citing *Viles* v. *State of California* (1967) 66 Cal.2d 24, 32-33 [56 Cal.Rptr. 666, 423 P.2d 818].) The statute will be construed when its meaning is doubtful so as to suppress the mischief at which it is directed, to advance or extend the remedy provided, and to bring within the scope of the law every case which comes clearly within its spirit and policy. (*Montessori Schoolhouse of Orange County, Inc.* v. *Department of Social Services* (1981) 120 Cal.App.3d 248, 256 [17 Cal.Rptr. 14], quoting from *Lande* v. *Jurisich* (1943) 59 Cal.App.2d 613, 616-617 [139 P.2d 657].)

■ The Commissioner attempts to characterize the February 1978 transaction as a loan from the Booths to Robinson, arguing that the February 14, 1978 agreement "is most fairly read as a layman's attempt at drafting a promissory note," and correctly states that Robinson would not need a real estate license to be the recipient of a loan. He seeks to characterize the second transaction as a partnership between Robinson and the Booths in which Robinson acted only on her own behalf.[3] The trial court rejected any

---

[3]Section 10133, subdivision (a) excludes from the definition of a real estate broker one who performs acts which would otherwise require a license with reference to her own property.

inferences that the Booths had loaned money to Robinson and entered into a partnership with her, and instead found that Robinson had acted within the license provisions of the Real Estate Law. (§§ 10000-10602.)

The basic prohibition against acting without a license is set forth in pertinent part in section 10130: "It is unlawful for any person to engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this state without first obtaining a real estate license from the department." A real estate broker is defined in relevant part in section 10131 as ". . . a person who, for a compensation or in expectation of a compensation, does or negotiates to do one or more of the following acts for another or others: [¶] (a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property . . . . [¶] . . . (d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property . . . . [¶] (e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property . . . , and performs services for the holders thereof."

Thus, pursuant to section 10130, a license is required not only to *act* as a real estate broker, but also to *assume* to act as a broker, i.e., to assume to perform acts set forth in section 10131. Common sense dictates that a licensee engaged in fraud generally will not carry through with the acts that she pretends or deceitfully leads another to believe she will perform. Here the trial court could infer that in the first transaction Robinson assumed to "put" the Booths' money in real estate by, on their behalf, lending funds on the security of real property, acquiring an interest in real property or acquiring an interest in a note or notes secured by real property or secured by mortgages or deeds of trust. Those possibilities constitute reasonable interpretations of "putting" money in real estate, the term used by Mr. Booth to describe the acts Robinson assumed to perform. In the second transaction, the evidence supports an inference that Robinson assumed to, on behalf of the Booths, acquire some interest in or lend funds on the security of the Jackson Street property. In either transaction it would not have mattered if Robinson took such actions in her name rather than in the names of the Booths as she would have held the interests in trust for them as their fiduciary. Additionally, in the second transaction it could be inferred that Robinson was acting as a broker on behalf of the then owner of the Jackson Street house. That Robinson never in fact made the investments for the Booths does not preclude recovery for she had assumed to do so.

Robinson obviously acted in the expectation of compensation. If she had carried through with her promises to invest the funds of the Booths, she would have received a fee on the placement of loans or a commission on the sale of property or notes, or, in the second transaction, upon resale of the property. As it was, she was compensated handsomely through absconding with the Booths' money. That Mr. Booth, a man of limited education, did not know whether or how she might make money in connection with the transactions is not significant. Were that to operate to deny recovery, persons unsophisticated in business transactions and least able to protect themselves from the artifice and fraud of unscrupulous licensees would be at a disadvantage in seeking to recover under section 10471 due to their inability to understand the nuances of transactions in which they were defrauded. Certainly, that was not the intention of the Legislature in enacting this remedial statute.[4] To the contrary, the Booths appear to fall precisely within the class of persons for whom the Legislature sought to provide benefits, i.e., *victims unable to protect themselves against the fraud and scheming of licensees in real estate transactions.*

Robinson explicitly led the Booths to believe that she was going to invest in real estate for them rather than putting their money in some other type of investment even though the details of the transactions were not clear to the Booths. It is hard to imagine that the Booths would have turned over their life savings to Robinson for investment in something other than real estate as they were relying upon her expertise and knowledge as a real estate broker. Robinson, who had previously handled real estate transactions for the Booths, outwardly seemed beyond her promises to invest their funds in real estate to be acting as a broker. In the first transaction the document executed by the parties described her as "Mildred B. Robinson of M. B. Robinson & Co., a real estate company." In the second transaction Robinson had placed her "For Sale" sign on the property which was owned by some other person or persons.

Reasonable inferences may be drawn from the evidence that Robinson assumed to act as a real estate broker in both transactions with the Booths and was therefore required to be licensed to engage in such activities pursuant to sections 10130 and 10131. Even if it could also be inferred that the

---

[4]The Commissioner relies upon *Nordahl* v. *Department of Real Estate, supra,* 48 Cal.App.3d 657, 661, for the proposition that "the Legislature intended minimum and limited rather than maximum benefits to those otherwise qualifying." However, *Nordahl* and the other cases which have employed such language were all referring to limitations on the *amount of recovery* available under section 10471, not to any limitations on *eligibility for recovery.* (See *Froid* v. *Fox* (1982) 132 Cal.App.3d 832 [183 Cal.Rptr. 461]; *Dombalian* v. *Fox* (1979) 88 Cal.App.3d 763 [152 Cal.Rptr. 86]; *Fox* v. *Prime Ventures, Ltd.* (1978) 86 Cal.App.3d 333 [150 Cal.Rptr. 202]; *Shirai* v. *Karpe* (1976) 57 Cal.App.3d 276 [127 Cal.Rptr. 549]; *Wolff* v. *Hoaglund* (1970) 11 Cal.App.3d 227 [89 Cal.Rptr. 778].)

Booths made a loan to Robinson in the first transaction and entered into a partnership with her in which she did not assume to act on their behalf in the second transaction, the trial court rejected such inferences. The court's determination is supported by substantial evidence and is not to be disturbed on appeal.

A review of the decisions which have denied recovery from the Fund on the basis that the licensee had not performed acts requiring a license discloses nothing to affect the decision in this case. All of those cases are distinguishable from this case in two respects. First, none of them considered the provisions of section 10130 requiring that one who assumes to act as a real estate broker be licensed. Secondly, each case is factually distinguishable from the present case.

In *Froid* v. *Fox* (1982) 132 Cal.App.3d 832 [183 Cal.Rptr. 461] the trial court's denial of recovery was upheld on the ground that the broker had acted as a principal. The broker had solicited purchasers of interests in a limited partnership that had not yet been formed. The court held that the broker could not act on behalf of entities which were not in existence. Here, Robinson acted on behalf of the Booths and the owner of the Jackson Street property, and there is no question of her acting on behalf of an entity yet to be formed.

*Buccella* v. *Mayo* (1980) 102 Cal.App.3d 315 [162 Cal.Rptr. 369] reversed a grant of recovery because no competent evidence had been presented regarding the transactions, only conclusory declarations. The court also noted, however, that the allegations in the pleadings contained nothing suggesting that the licensee had acted other than as a principal. In one transaction, he allegedly executed a note and deed of trust in favor of third parties who the same day assigned the note and deed of trust to the plaintiff. The plaintiff paid money to a savings and loan which received it on the licensee's behalf. The licensee characterized the transaction as a loan. In the second transaction there was no indication that the licensee had anything to do with a note and deed of trust which had been assigned to the plaintiff. Thus, the court found there was no evidence to support a finding that the acts of the defendant required a license. (*Id.*, at p. 326.) In this case, however, competent evidence was presented.

In *Robinson* v. *Murphy* (1979) 96 Cal.App.3d 763 [158 Cal.Rptr. 246] the broker sold his own home to the plaintiff. Although he had originally represented that he was the broker, he disclosed to the plaintiff that he was the seller prior to her execution of the purchase agreement. Thus, he acted on his own behalf and indicated to the plaintiff that he was doing so. Here,

Robinson never indicated to the Booths that she was not acting on their behalf.

The court in *Powers v. Fox* (1979) 96 Cal.App.3d 440 [158 Cal.Rptr. 92] held that recovery based upon the actions of Powers was barred because in one transaction the victim had been Powers' wife (see § 10472, subd. (a)), and at the time of the other transaction Powers had not been licensed. A second holding was that both transactions had been joint enterprises in which Powers had acted only for himself. The facts in *Powers* were somewhat unique. The victim of the fraud was the purported licensee's girlfriend and then wife during the transactions in question. In one, she borrowed money to be used for the purchase price and operating capital for a restaurant the parties were to operate together. The operating capital was placed in a joint checking account. In the other transaction the parties borrowed $15,000 from a bank on a joint note, some of which was used to purchase a condominium which Powers had represented would be taken in joint names and was actually taken in his name alone. In both transactions the parties specifically agreed to act together. In this case, the parties did not so agree. Rather, the Booths relied upon Robinson to act for them.

Finally, in *McGaughey v. Fox* (1979) 94 Cal.App.3d 645 [156 Cal.Rptr. 593] the trial court impliedly found that the corporate broker had acquired in its own right the investment units which it subsequently sold to the plaintiff. The appellate court held that the implied finding that the broker acted on its own behalf was supported by the evidence. Here, the trial court's implied finding that Robinson assumed to act on behalf of others is also supported by the evidence.

The above cases are so factually dissimilar from the present case that they are not instructive with respect to the facts involved here. None of the holdings compel any conclusion that the trial court's decision in this case was not supported by substantial evidence.

The Booths also contend that Robinson was required to be licensed as a real property securities dealer pursuant to sections 10237, subdivision (a) and 10237.3, which require that one who engages in the business of selling real property securities to the public obtain a real estate broker's license and have attached thereto an endorsement as prescribed by the Commissioner. At the time of the transactions in question here, section 10237.1, subdivisions (a) and (c) defined a real property security as an investment contract or real property sales contract having certain characteristics, or one of a series of promotional notes secured by liens on separate parcels of real property in one subdivision or in contiguous subdivisions. Since there was

no evidence that Robinson sold any contract or promotional note, she performed no acts requiring licensing as a real property securities dealer.

The judgment is affirmed.

King, J., and Haning, J., concurred.