Filed 5/3/13  Marriage of Erler CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of YASHAR ERLER and AYLA ERLER. | |
| YASHAR ERLER, Respondent, v. AYLA ERLER, Appellant. | A134652 (San Mateo County Super. Ct. No. FAM0113045) |

Ayla Erler appeals from an order after trial upholding the validity of a premarital agreement she entered with now former spouse Yashar Erler.[1]  She complains that, while the court made findings on her claims that the agreement was unenforceable, unconscionable or involuntarily entered for purposes of the Uniform Premarital Agreement Act (the Act) (Fam. Code, § 1600 et seq.), the court did not address rescission due to mistake of fact based on a mistranslation of the agreement into Turkish, or address reading an assertedly inconsistent provision in the same agreement as negating the English version's support waiver.  We reject her contentions and affirm the order.

---

[1]  We use the parties first names for sake of clarity (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475–476, fn. 1), also cognizant that Ayla's last name was Solmaz when she entered the premarital agreement.

1

The parties executed their premarital agreement in March 2009, about a month before marrying that year.[2]  Yashar was a longtime California resident, fluent in English and his first language, Turkish.  He had adult children from a prior marriage, real estate holdings and other assets, and wanted to ensure that his children inherited his property and that he not have support obligations should the marriage not last.  Ayla, a Turkish citizen, also had adult children from a prior marriage, and, while college educated in Turkey, could not speak or read English.  She had moved into Yashar's San Carlos home in late November 2008, and, by January 2009, the parties were discussing marriage.  Yashar told her that he wanted a premarital agreement, and she agreed, thus launching a chain of events that led to signing the written agreement signed on March 12.

*Ayla's Support Motion and Issues*

The parties separated in March 2011, less than two years into the marriage, and Yashar petitioned for dissolution a month later.  Ayla had moved in with her son in San Mateo after reporting domestic violence by Yashar and getting a restraining order against him.  She retained counsel and filed a motion for temporary support and attorney fees, not mentioning this mutual waiver of support in the premarital agreement:

"**9. SUPPORT.**  Each party has been self-supporting for a period of time prior to the contemplated marriage.  Both parties feel that they are capable of future self-support and of maintaining themselves on a self-supporting basis.  Therefore, in the event of a marital separation or dissolution, it is agreed and understood that neither party shall seek or obtain any form of alimony or support from the other, or seek any relief, other than a distribution of their joint property interests or those property interests acquired during the course of the marriage, in any manner other than as provided by this Agreement."

Yashar raised the agreement in opposition, also seeking sanctions from Ayla for bad faith in initiating her support request.

---

[2]  For ease of discussion, all dates in this opinion are in 2009 unless specified otherwise.

In further filings and declarations, Ayla recounted her version of events leading to the marital agreement, painting the process as one-sided and unfair in various respects. She ultimately took the position, legally, that the agreement was unenforceable under provisions of the Act because she did not execute it voluntarily, lacked independent legal counsel, lacked seven calendar days to review the agreement beforehand, signed under undue influence caused by Yashar's presence, and had a Turkish translator who acted as Yashar's agent. She also argued, under the Act, that enforcing the support waiver would be unconscionable.[3]

---

[3] Family Code section 1612, subdivision (c): "Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, or if the provision regarding spousal support is unconscionable at the time of enforcement. An otherwise unenforceable provision in a premarital agreement regarding spousal support may not become enforceable solely because the party against whom enforcement is sought was represented by independent counsel."

Family Code section 1615: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:

"(1) That party did not execute the agreement voluntarily.

"(2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party:

"(A) That party was not provided a fair, reasonable, and full disclosure of the property or financial obligations of the other party.

"(B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.

"(C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"(b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

"(c) For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following:

*Trial*

The agreement's validity/enforceability ultimately came before the Honorable Richard Dubois for a trial (long-cause hearing) on those issues. The evidence consisted of documents and declarations from the filings, live testimony from the parties and attorney Douglas Holloway and translator Huseyin Kulunk, and a transcript of a March 12 meeting at Holloway's San Francisco offices at which the agreement was discussed and signed, with Kulunk translating for Ayla by telephone (evidently on speaker mode).

Issues presented about enforceability under the Act were ultimately resolved against Ayla, including credibility determinations against her version of some events. Her lack of appellate attack on any of those resolutions makes a brief summary of the evidence sufficient to frame the issues she does raise.

"(1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel.

"(2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed.

"(3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information.

"(4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.

"(5) Any other factors the court deems relevant."

4

Based on discussions with Ayla in early 2009, Yashar found Attorney Ross Madden from the Internet and had him prepare an initial draft agreement, which he reviewed in detail with Ayla after receiving it in late February, reading it completely to her while translating into Turkish. Then, having gotten Holloway's name from Madden, Yashar referred Ayla to Holloway, a non-Turkish-speaking attorney whom he paid to represent her. Yashar also found on the Internet and hired Kulunk, of Turkish translation service Crescent & Star, Inc., in Berkeley. Working from the English draft, Kulunk prepared and by March 5th returned to Yashar a written Turkish translation. Yashar handed the translation to Ayla, who read it through in his presence. (Ayla's contrary account was that Yashar had earlier only explained or read aloud parts of the translation, and that she never had a Turkish version to read until the signing at Holloway's office on March 12, where she had just 10 to 15 minutes to do so.) Ayla had expressed to Yashar some concerns about the draft, and he directed her to talk with her attorney about them.

Changes desired by Ayla were discussed and made at the March 12 meeting in Holloway's office before the agreement, revised and in its English form, was signed by the parties and notarized. Yashar drove Ayla to the meeting, given that Ayla did not have a driver's license, and, after initially entering the office, he went off to a coffee shop for 45 to 60 minutes while Ayla reviewed and discussed the draft with Holloway. Ayla also had Kulunk's written Turkish translation before her, and as Yashar had arranged for the meeting and signing, Kulunk provided English-Turkish and Turkish-English translations over the phone. When Yashar returned to the office, Holloway explained the changes to him, having already phoned him about some while he was out. Yashar agreed to all of them, and the parties signed the agreement as modified by Holloway on a computer right there in the office. Kulunk later made the changes to the Turkish draft as well, and the parties signed that one a few days later at home, in Yashar's office. It was understood below that the English version was the one to be signed, the Turkish version being only to help Ayla understand.

The several changes that Ayla secured all inured to her benefit and, in Yashar's view, were minor. Ayla's appeal arguments rely on changes to what she calls

5

"paragraphs" 4 and 9, concerning debt and support. "Paragraph" is a misnomer in that each numbered part has *multiple* paragraphs, but we use her designation for ease in stating her arguments.

The final version of paragraph 4 reads in part: "**4. DEBT.** Each party agrees to be separately liable for his or her debts incurred prior to the marriage. During the course of the marriage, Mr. Erler shall be responsible for any expenses incurred for the basic necessities of life, such as food, basic clothing needs, shelter, and medical care." The initial draft is evidently not in our record, but as recited during testimony, the language was the same except for the words we italicize in this portion: " 'During the course of the marriage *both parties* shall be responsible for any expenses incurred for the basic necessities of life . . . .' " Paragraph 9, quoted earlier in its final version, had stated initially that the parties could independently support themselves, from their own properties. That was deleted, leaving this softer preamble to the support waiver: "Each party has been self-supporting for a period of time prior to the contemplated marriage. Both parties feel that they are capable of future self-support and of maintaining themselves on a self-supporting basis." Ayla explained below that she had no properties and, while able to take care of herself and pay her own expenses in Turkey by living with family (or her mother), had felt unable to support herself in California.

Testimony and a new Turkish-English translation prepared for trial showed that the support waiver in Turkish, as translated by Kulunk, was inaccurate. The English version stated, "Therefore, in the event of a *marital separation or dissolution*, it is agreed and understood that neither party shall seek or obtain any form of alimony or support from the other . . . ," while the Turkish one read, "Therefore, in the event of a *court ordered marital separation or dissolution of marriage*, it is agreed and understood by the parties that neither party shall seek or obtain any form of alimony or allowance from the other . . . ." (Italics added.) Kulunk confirmed his erroneous translation in testimony. Ayla presented this evidence below, but not in the context of any claim that the support waiver should be rescinded for mistake of fact.

6

*Decision*

The court issued a four-page written decision captioned, "FINDINGS AND ORDER ON VALIDITY OF PREMARITAL AGREEMENT." The order was, "The Premarital Agreement executed on March 12, 2009 is valid and enforceable." Pertinent findings, as numbered in the decision, were as follows:

1. The parties executed the agreement on March 12.

2. Ayla does not speak or read English, but is fluent in Turkish. The signed document was in English, but preliminary and final drafts of it were translated in writing into Turkish.

3. The parties married on April 15.

4. Starting "as early as January," the parties "discussed in general terms" Yashar's request that they enter into a premarital agreement. Yashar retained an attorney to draft one. Ayla received a copy of the draft by e-mail on February 26, and on that date, Yashar "went over the entire Premarital Agreement, translating the terms into Turkish, with [her]." A written Turkish translation of the agreement was given to Ayla on March 5.

5. On or before March 5, Yashar explained to Ayla her need to review the agreement with her own attorney. He set an appointment for her to see Holloway, who had no prior relationship with Yashar and was recommended by his own attorney, and Yashar arranged to pay his fee. Holloway acted independently on Ayla's behalf during the entire course of events, did so without conflict, and never breached the attorney-client privilege between himself and Ayla. Ayla met with him on March 12, and the agreement was signed at the conclusion of that meeting.

6. Yashar arranged and paid for interpreter Kulunk to translate the English document into Turkish. Kulunk had no relationship with any of the parties, acted in a neutral fashion throughout, neither tried to nor did influence Ayla to accept Yashar's views and, while at times explaining what Yashar told him about Ayla's questions and proposed changes, never acted to suggest anything against her interests.

7. Ayla "denied ever seeing the English or Turkish version of the [agreement] prior to her meeting with [] Holloway," and "[h]er testimony was not credible."

7

Holloway was not sure but believed that Ayla had reviewed the Turkish version before seeing him, and a recording of the conference between them, "viewed as a whole," supported that Ayla read and was familiar with the terms of the agreement. She stated on several occasions that she understood and agreed to the terms, and her statements indicated that "she had a good understanding," such that it appeared "she must have had more than [just] a few minutes to review the document in [] Holloway's office."

8. Shortly after executing the English agreement, a Turkish translation was sent to Ayla, "and she never, thereafter, objected to or questioned any of its terms."

9. In light of those findings, the court ruled: A. Ayla executed the agreement voluntarily, not at any time under duress, fraud or undue influence, did not lack capacity to enter into the agreement "and, in fact, understood the nature and effect of the agreement." B. The agreement was not unconscionable when executed, and Ayla "was provided a fair, reasonable, and full disclosure of the property or financial obligations of [Yashar]." C. Ayla was represented by independent legal counsel when she signed. D. She had at least seven calendar days between both the time the agreement was first presented to her (with advice to seek independent counsel) "and the time the agreement was signed." E. The marriage lasted less than two years. "No substantial inequitable events transpired during the marriage"; "the provisions in the [agreement] waiving the right to spousal support were understood, agreed to, and enforcement of those provisions [is] not unconscionable at this time."

Ayla did not challenge the statement of decision or seek rehearing. The decision was filed on December 23, 2011, and Ayla appealed the order on February 17, 2012.

## DISCUSSION

Ayla does not challenge the evidentiary or legal bases for any of the findings actually made. Rather, she complains that the decision (1) did not address mistake of fact assertedly caused by mistranslation of the support provision into Turkish, and (2) did not consider incongruity between the English version's waiver of temporary support and the modified provision requiring that Yashar provide her with the necessities of life during marriage, neither of which issue she raised below. Thus, and while conceding that the

8

agreement's support provision bars support now that the marriage has been dissolved, Ayla asks us to hold, for the first time on appeal, that the provision, to the extent that it bars post-separation *temporary* support for the 11 months before the dissolution, must be rescinded for unilateral mistake of fact[4] or, alternatively, read to allow temporary support because to deny it is inconsistent with the modified necessities-of-life paragraph. For the reasons that follow, we reject those arguments.

## I. *Review Limitations*

Ayla's opening brief tends to couch her contentions as failures by the court to make findings in its statement of decision. Thus she argues as to mistake of fact: "The trial court did not address this mistake, and upheld the premarital agreement exactly as written in English, despite the undisputed differences between the English [version of the support] agreement and the translation that [Ayla] relied upon." She argues as to her inconsistent-provisions claim—the support waiver in paragraph 4 versus Yashar's liability for basic-necessities debt in paragraph 9: "The trial court's order did not consider how the language in Paragraph 4 affects the proper interpretation of Paragraph 9." Given the tenor of those attacks, yet Ayla's failure to raise them below, Yashar correctly argues that *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130 (*Arceneaux*), bars attacks on the decision and requires this court, on appeal, to imply findings in support of the decision.

*Arceneaux* explains: "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.] [¶] [Civil Code s]ections 632 and 634 . . . set forth the means by which to avoid application of these inferences in favor of the judgment. When the court announces its tentative decision, a party may, under section 632, request the court to issue a statement of decision explaining the basis of its determination, and shall specify the issues on which the party is requesting the statement; following such a request, the party

---

[4] Noting a severability provision in the premarital agreement's support section, Ayla concedes that rescinding the temporary support waiver would not affect her waiver of regular support.

9

may make proposals relating to the content of the statement. Thereafter, under section 634, the party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. The section declares that if omissions or ambiguities in the statement are timely brought to the trial court's attention, the appellate court will not imply findings in favor of the prevailing party. The clear implication of this provision, of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*Arceneaux*, *supra*, 51 Cal.3d at pp. 1133–1134, fns. omitted.) The reason is fairness: "[I]t would be unfair to allow counsel to lull the trial court and opposing counsel into believing the statement of decision was acceptable, and thereafter to take advantage of an error on appeal although it could have been corrected at trial. [Citations.] [As to court failure to respond to an issue], [i]t is clearly unproductive to deprive a trial court of the opportunity to correct such a purported defect by allowing a litigant to raise the claimed error for the first time on appeal." (*Id*. at p. 1138.) Waiver includes claims of insufficient evidence to support a determination. (*Id*. at p. 1138, fn. 6.)

In her reply brief, Ayla does not dispute or even acknowledge *Arceneaux*, and we infer that she concedes inability to claim deficiencies in the findings or decision as error. Nevertheless, developing a precautionary argument by Yashar that she is also barred by the theory-of-trial doctrine, Ayla asks us to reach her mistake-of-fact and inconsistent-provisions claims as posing pure questions of law on undisputed facts, a discretionary exception to the theory-of-trial bar.

Generally, "a party to an action may not, for the first time on appeal, change the theory of the cause of action. [Citations.] There are exceptions but the general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact. If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. [Citation.] But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should

10

not be required to defend against it on appeal. [Citations.]" (*Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340–341.) The rule is "founded on considerations of practical necessity in the orderly administration of the law and of fairness to the court and the opposite party [citation]" (*California State Auto. Assn. Inter-Ins. Bureau v. Antonelli* (1979) 94 Cal.App.3d 113, 122), as well as principles of waiver and estoppel (*Smith v. Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 629–630), and whether to depart from it where an exception may apply is largely a matter of discretion for this court (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879).

We examine each of Ayla's arguments in light of those review limitations.

## II. *Rescission for Mistake of Fact*

"A party may rescind a contract if his or her consent was given by mistake. (Civ. Code, § 1689, subd. (b)(1).) A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances. Civil Code section 1577 states in relevant part: 'Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract . . . .'" (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278, fn. omitted (*Donovan*).) "Where the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant must establish the following facts to obtain rescission of the contract: (1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Id.* at p. 282.)

Although she never presented her mistake-of-fact theory below, Ayla marshals what record evidence she can on each of the elements quoted above and argues that the record supports rescission as a matter of law on undisputed facts. But she is mistaken— legally.

11

Most fundamentally, and dispositively, we cannot say as a matter of law that Ayla "made a mistake regarding a basic assumption upon which [she] made the contract . . . ." (*Donovan*, *supra*, 26 Cal.4th at p. 282.) While we might reasonably infer as much, Ayla never declared or testified *directly* that she relied on the Turkish mistranslation to form a mistaken view that she could receive temporary support if a marital separation ensued that was not "court ordered." Even if she had said so directly, we would have an issue of credibility, especially since the trial court found that another aspect of her testimony (claiming she never had a Turkish copy of the agreement until the signing) was "not credible." We are bound to presume that an order is correct and indulge all intendments and presumptions in favor of its correctness (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718), and thus would have to imply, and if reasonable uphold, a finding that Ayla was similarly not credible in stating that she relied on the Turkish translation. As stated by our high court in a marriage case long ago: "[A] trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it, and this rule applies [equally] to an affidavit." (*Lohman v. Lohman* (1946) 29 Cal.2d 144, 149.)

But without direct evidence on the mistake-based-on-mistranslation point, Ayla's claim of undisputed facts amounts to a claim that the point follows from reasonable inferences that all point to the same conclusion. "Even where there is no conflict in the evidence, if the evidence is subject to opposing inferences it must upon a review thereof be regarded in the light most favorable to the support of the judgment. [Citation.] When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citation.]" (*Booth v. Robinson* (1983) 147 Cal.App.3d 371, 377.)

Reasonable inferences go both ways in this case. On one hand, we could infer from certain evidence, as Ayla does, that she relied on the Turkish mistranslation. She did not read English and testified generally that she relied on the translation by Kulunk; she was given a copy of that translation on March 5 (notwithstanding her "not credible" testimony to the contrary); Yashar testified that he saw her read it through in his presence

12

on that date; Ayla testified that she expected, at signing, that Yashar that would pay her living expenses "[u]ntil the end of the divorce"; she acknowledged at the signing that she had "read and understood" the Turkish version; she testified and declared for the trial (in present tense, anyway) that she understood the Turkish version to mean that Yashar would support her until a legal separation or divorce; and consistent with that understanding, she made a point of having the debt wording of paragraph 4 on "basic necessities" amended to state that Yashar, not each party, was liable for basic necessities during the marriage.

On the other hand, we can reasonably infer that Ayla never noticed or relied on the mistranslation. Yashar was fluently bilingual; he testified that he explained the English draft to Ayla *completely* on February 26 or 27, word for word (despite Ayla's claim that he read only parts) while orally related its terms to her in Turkish; there is no evidence that Yashar made the translation error Kulunk would later make in drafting the written versions; Ayla immediately raised questions and concerns about "Social Security benefits" and "basic life expenses," but not about the proposed waiver of support in the event of a separation. Also, the court expressly found, although not as to any mistake-of-fact claim, "[s]hortly after [the parties] execut[ed] the English agreement, a Turkish translated version was sent to [Ayla] and she never, thereafter, objected to or mentioned any of its terms," and that supports the idea that she never noticed the Turkish mistranslation until this litigation arose. So does her lament, in declaration, that "[i]f it were not for my daughter being here to visit and provide emotional support and translation for me, I would still not understand completely what has occurred in this case"; it suggests that her daughter was the one who first brought to her attention the discrepant language of the Turkish version. Ayla overlooks or ignores those inferences, as well as this further one: The court found her testimony about not having a Turkish version until the signing to be "not credible," but if this was not an outright lie, then it could reasonably be explained as misrecollection due to having had the translation earlier but not having paid any attention to it, then being presented with another copy at the

13

signing.  All of this reasonably supports finding lack of reliance by Ayla on the support waiver mistranslation until this litigation.

A separate problem for Ayla is that the court expressly found that she "did not lack capacity to enter into the agreement and, in fact, *understood the nature and effect of the agreement*."  (Italics added.)  The nature-and-effect finding seems to have been addressed to statutorily prescribed criteria for deciding whether an agreement was signed "voluntarily" under the Act (Fam. Code, § 1615, subd. (c); see fn. 3, *ante*), and was certainly not addressed to any mistake of fact claim.  Nevertheless, our duty to imply findings in support of the order makes it impossible to square that voluntariness conclusion with Ayla's position now that mistake of fact is established as a matter of law.

Finally, we are surprised that neither party addresses a fairly obvious question, peculiar to the facts of this case, that the trial court might have relied on to find mistake of fact immaterial had it been properly presented.  While the parties' briefing appears to equate the Turkish mistranslation—"court ordered separation"—as equivalent to a formal court decree of marital separation, that was not something drafted by a lawyer and might not be how a nonlawyer, particularly Yashar, viewed the matter.  The parties' separation began on March 25, 2011; Ayla declared that she obtained a temporary restraining order against Yashar that took effect five days later and remained in effect thereafter; and Yashar declared that, a month after the separation, the court granted him exclusive temporary use, possession, and control of his residence in San Carlos and "ordered that [Ayla] vacate" it.  Quite likely, a lay person in circumstances where a court has ordered the wife out of the marital abode and ordered the husband to stay away from the wife, would consider that there was a "court ordered separation," thus making the support waiver effective even under the Turkish mistranslation.

We do not find that mistake of fact is established so as to fall within the exception to the theory of trial doctrine.  Factual nuances set out above also highlight how unfair it would be to Yashar and the trial court to reach such an issue when there was no chance below to fully explore and clarify that evidence in the legal context Ayla now raises.

### III. *"Inconsistent" Support Provisions*

Ayla's claim of inconsistency between paragraphs 4 and 9 requires a different analysis, for her counsel did raise the issue of "inconsistency" below, although not in the sense now urged. Her argument on appeal is that paragraph 4, after being modified at Ayla's behest to eliminate the self-supporting sentence and make Yashar liable for debts incurred for basic necessities "during the marriage," trumps paragraph 9's provision that all right to support terminates upon a marital *separation* of the parties—that is, before a dissolution decree would legally terminate the marriage. Below, Ayla's counsel raised inconsistency, but evidently as impeaching Yashar's testimony that he felt that the marriage was over once they had separated, and as supporting the reasonableness of Ayla's contrary view.

We initially reject grousing by Ayla that the trial court erroneously missed the relevance of the inconsistency. She writes that, during Yashar's testimony, when her counsel "pointed out that Paragraph 4 of the agreement required [him] to be responsible for the basic necessities of life '[d]uring the course of the marriage,' the trial court sustained a relevancy objection, ruling that Paragraph 4 '[d]oesn't go to the validity of the agreement.' . . . However, the issue presented in the trial court proceedings, and in this appeal, is whether [Ayla] is entitled to temporary spousal support. Paragraph 4 is relevant to this issue, because it bears on the proper interpretation of the premarital agreement as a whole. Therefore, the trial court's refusal to address this issue in its December 23, 2011 order and refusal to admit relevant evidence on this issue both constitute reversible error." Not only is this a procedurally deficient claim of error without a proper heading identifying it as such (Cal. Rules of Court, rule 8.204(a)(1)(B)), and violating *Arceneaux* by being raised without having been properly called to the court's attention below, it unfairly fails to mention that the court's final ruling was: "I am going to sustain the objection *as to what the conduct has been since the marriage*." (Italics added.) The questions put to Yashar had been whether he was "still married to [Ayla]" and was "paying any of [her] expenses now." The ruling quite properly limited the testimony, narrowly, to the enforceability questions under the Act posed by the

15

parties. If Ayla sought consideration of further issues, it was her counsel's duty to clarify what those issues were during the examination.

The essence of the argument Ayla now presents on appeal is summarized in her briefing this way: " 'Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.' (Civ. Code, § 1652.) As such, the premarital agreement must be interpreted as obligating [Yashar] to provide interim support after separation but before a court ordered divorce."[5]

The argument fails on this record. "The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a

---

[5] Ayla's counsel did make an argument below that was tantalizingly close to what she argues now: "I believe this document . . . contains some provision[s] in here that provide for the support of [Ayla] that is [in] clear contradiction to the paragraph nine of the premarital agreement. I believe it negates it and supersedes it." The trouble is that counsel's reference was not to internal inconsistency, but to inconsistency with a separate document—an affidavit of support (Form I-864, Dept. of Homeland Security, U.S. Citizenship & Immigration Services) Yashar had executed as a United States citizen on Ayla's behalf, two weeks after their marriage. In it, and working with an immigration attorney, Yashar had acknowledged under oath that he had to "[p]rovide the intending immigrant any support necessary to maintain him or her at an income that is at least 125 percent of the Federal Poverty Guidelines for his or her household size," and that "divorce **does not** terminate your obligations under this Form I-864." The court allowed Yashar to be questioned briefly about the affidavit of support but found no relevance to the issues before it. Confronting a relevance objection to questioning Yashar as to whether he was currently abiding by that agreement, the court ruled: "I will sustain the objection. The document even says it is a document creating a contract between him and the United States Government. It is not going to go to the validity of the [marital agreement]." Ayla notes the ruling but does not challenge it.

16

written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

An obstacle to our reaching the internal inconsistency claim as a pure question of law is that, while not specified as such, there was in effect extrinsic evidence introduced on both sides of the issue, evidence that was not only in conflict but presented credibility questions for a court that found parts of Ayla's testimony to lack credibility. Evidence about modifications of other parts of the agreement were, of course, extrinsic to the language of the support waiver itself, but beyond that, Ayla testified that she felt that a marriage and support right existed until a court-ordered divorce, and that such a right corresponded with the amendments rendering Yashar liable for her basic necessities during the marriage. Yashar testified (in December 2011, before the dissolution) that he no longer considered himself married to Ayla and that the marriage was over after the March 25, 2011, separation. The parties were not lawyers, Ayla having a B.A. in business administration and Yashar being a real estate agent and investor, and it seems that the court might have been sympathetic to Yashar's lay view of the matter. The court wrote in its decision, clearly using the March 2011 separation date that Yashar deemed the end of his marriage: "The parties' marriage lasted less than two years." The amended wording in the debts part of the agreement (paragraph 4) relied on by Ayla, moreover, rendered Yashar responsible for basic necessities "[d]uring the course of the marriage . . . ." Lawyers tend to view marriage by *legal* status and duration, of course, but it seems reasonable to question whether a lay person would understand an apparently permanent separation to be part of "the course of the marriage."

For all of the above reasons, we cannot resolve Ayla's inconsistent-provisions argument in her favor as a matter of law on this record.

### IV. *Sanctions for Frivolous Appeal*

In the single sentence comprising the "**Conclusion**" paragraph of his respondent's brief, Yashar asks that we affirm the order, grant him costs on appeal, and "award [him] attorneys' fees on appeal on the basis that Ayla's appeal is frivolous and lacking in merit . . . ." Our unqualified affirmance of the order entitles him to ordinary costs on

appeal without a request (Cal. Rules of Court, rule 8.278), and his request for sanctions for a frivolous appeal is deficient, procedurally, for failure to make a proper motion (*id*., rule 8.276), and substantively, for failure to show frivolousness under pertinent legal authority and standards (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637). Mere lack of merit does not render an appeal frivolous. (*Id.* at pp. 649–651; *City and County of San Francisco v. Grant Co.* (1986) 181 Cal.App.3d 1085, 1093.) The sanctions request is denied.

## DISPOSITION

The order is affirmed.

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Lambden, J.