179 N.J. Super. 485 (1981)
432 A.2d 567
JAN ALAN BRODY, PLAINTIFF,
v.
JOSEPH ALFIERI AND THE NEW JERSEY REAL ESTATE COMMISSION, DEFENDANTS.
Superior Court of New Jersey Chancery, Division Hudson County.
Decided March 2, 1981.
*487 Checki & Politan for plaintiff (Nicholas H. Politan, appearing).
John J. Degnan, Attorney General of New Jersey, for defendant New Jersey Real Estate Commission (Elise Goldblat, Deputy Attorney General, appearing).
*488 No appearance on behalf of defendant Joseph Alfieri.
GAULKIN, J.S.C.
Plaintiff Jan A. Brody (Brody) brought this action to rescind a real estate purchase contract and to recover the deposit which he had paid. In addition to naming the seller, Joseph Alfieri (Alfieri), as a defendant, Brody joined the New Jersey Real Estate Commission (Commission), seeking payment from the Real Estate Guaranty Fund (Fund) of any unpaid judgment against Alfieri, to whom a broker's license had been issued. See N.J.S.A. 45:15-34 et seq. Default judgment has been entered against Alfieri in the sum of $9,758, representing the deposit paid and incidental expenses incurred by Brody in preparing for closing. A writ of execution has been returned unsatisfied, and Brody now seeks an order directing the Fund to pay the amount of that judgment, together with counsel fees and costs. N.J.S.A. 45:15-37. The Commission denies liability of the Fund, asserting that (a) Alfieri was not a licensed broker at the times in question; (b) Alfieri's role in this transaction was as seller rather than as licensed broker, and (c) Brody has not yet exhausted other avenues of collection of the judgment.
The operative facts have been stipulated. In September 1979, interested in purchasing a condominium apartment at Harmon Cove in Secaucus, Brody telephoned Joseph Alfieri Realty in Secaucus, so listed in the telephone book; a recording device answered the call with the identification, "Joseph Alfieri Realty." Thereafter Alfieri returned Brody's call and told Brody he had only one condominium unit available for sale, which was his own. Those discussions did not proceed further.
In the last week of October 1979 Brody saw a newspaper advertisement describing a Harmon Cove condominium for sale; on calling the telephone number listed in the advertisement, Brody found himself again talking to Alfieri, who stated that the unit advertised was his own, the same one they had previously discussed. Several days later Brody went to the apartment, *489 where Alfieri resided, and the next day reached oral agreement with Alfieri as to the purchase.
On November 2 Brody gave Alfieri a $150 check payable to "Joseph Alfieri" as a deposit pending execution of the contract, and Alfieri signed a receipt on November 5 acknowledging that deposit. On November 7 the parties entered into a written contract for the sale and purchase of the unit for $90,000 and providing for a deposit of $9,000 "to be held by Seller's attorney until closing." The contract, prepared by Brody, a New Jersey attorney, included the following provision:
The parties hereby acknowledge that there is no real estate commission to be paid as a result of this transaction. In the event that such a commission has been earned as a result of this transaction, same shall be the responsibility of the Seller.
Alfieri had told Brody that he had not yet retained an attorney and accordingly Brody prepared a letter, delivered to Alfieri at the time of the execution of the contract on November 7, which stated:
If you have not yet retained an attorney to represent you in the matter, I will agree to depositing the check in your real estate brokers trust account to be held by you in trust as the broker in this matter pending closing.
Alfieri orally agreed to this arrangement and Brody thereupon delivered to him a check made payable to "Joseph Alfieri Realty Trust Account" for the balance of the deposit, $8,850. That check was endorsed "For Deposit, Joseph Alfieri Realty Account # XX-XXXXXXX," but was deposited on November 8 in the regular checking account of Joseph Alfieri Realty at Meadowlands National Bank. The entire balance of funds in that account was subsequently dissipated by Alfieri.
Unaware of any misapplication of the funds, Brody proceeded to conduct his title search; during the period that he was preparing to close he was in touch with Alfieri both by telephone at "Joseph Alfieri Realty" and by correspondence directed to the apartment. In January 1980 Brody received his title report, which disclosed that liens exceeding the $90,000 purchase price burdened the unit. Recognizing that the transaction was *490 at risk, Brody tried to contact Alfieri and learned that the deposit was not being held in escrow and was not available.
Brody filed this action on January 18, 1980 and effected service on Alfieri on January 28. Alfieri failed to answer and Brody entered default on February 21; following proof hearing, judgment was entered on April 1 against Alfieri in the amount of $9,758.
On April 10 the Clerk of the Superior Court issued a writ of execution, which was returned unsatisfied by the Sheriff of Hudson County on July 29. In the interim, on April 24, Alfieri was found murdered in his apartment. Brody has since presented his judgment to the qualified executrix under Alfieri's will; whether and to what extent assets will be available to pay the judgment is not yet known.

I
The Commission acknowledges that Brody is a "person aggrieved by the embezzlement, conversion or unlawful obtaining of money" within the meaning of N.J.S.A. 45:15-34, but it argues that Brody has no claim against the Fund because Alfieri was not a "licensed real estate broker" after July 27, 1979.
Again the operative facts are stipulated. Alfieri had been licensed as a broker for the year ended June 30, 1979. In 1979, because of the implementation of a new computer system, the Commission was late in issuing its renewal licenses and therefore treated all brokers with 1978-79 licenses as still licensed from July 1, 1979 until their receipt of the 1979-80 renewal licenses. On July 27, 1979, when his 1979-80 renewal had been prepared but not yet mailed to him, Alfieri voluntarily surrendered his 1978-79 license to the Commission because of the pendency of a criminal investigation of allegations that he had misappropriated trust monies in transactions unrelated to this matter. The 1979-80 renewal which had been prepared cannot now be located; the Commission can neither confirm nor deny that the renewal license was sent to Alfieri after July 27. The *491 surrender of the 1979-80 license was accompanied by an understanding memorialized by Alfieri's then attorney that Alfieri "would not conduct or engage in any new real estate activities in New Jersey but would be able to finalize any pending real estate matters." The Commission never took formal action to suspend or revoke Alfieri's license following its surrender. Indeed, during the fall or winter of 1979-80 the roster of licensed New Jersey brokers promulgated by the Commission (N.J.S.A. 45:15-22) included Alfieri's name; on or about November 7, 1979, in response to an attorney's request in another matter, a Commission employee advised that Commission records showed Alfieri to be licensed; and on December 7, 1979, a notation was made in the Commission record that Alfieri was "inactive".
The conclusion to be drawn from these facts is that, whether by intention or inattention, the Commission did not take effective action to strip Alfieri of the authority granted to him under his broker's license. Rather, the Commission entered into an informal understanding with him as to the kinds of licensed activities he would conduct. Since Alfieri had been duly licensed, and his authority was restricted, if at all, only to a limited degree and in an informal manner, he must fairly be considered to have been a licensed broker whose wrongful conduct is subject to guaranty by the Fund. Cf. Powers v. Fox, 96 Cal. App.3d 440, 158 Cal. Rptr. 92, 96 (D.Ct.App. 1979).

II
The novel and more difficult question is whether the Fund is available to guaranty the loss sustained by Brody arising out of Alfieri's wrongful conduct in selling his own property.
The language of N.J.S.A. 45:15-34 describing the scope of the Fund's coverage does not specifically condition recovery on the role that the broker has played in the transaction:
A real estate guaranty fund is established as a special trust fund to be maintained by the State Treasurer and administered by the New Jersey Real Estate Commission in accordance with the provisions of this act to provide a fund from which recovery may be obtained by any person aggrieved by the *492 embezzlement, conversion or unlawful obtaining of money or property by a licensed real estate broker or real estate salesman or an unlicensed employee of a real estate broker; provided, however, that the amount of such recovery to be obtained by any person shall not exceed $10,000.00 for each claim filed. [Emphasis supplied]
The Commission urges that the statute cannot reasonably be read to require the Fund to respond for all wrongful conduct of persons who happen to be real estate licensees; that it must be read as intending to guaranty only losses arising from a licensee's conduct in performing a function for which he was licensed, and accordingly, that the loss sustained here as a result of wrongful conduct by Alfieri in selling his own property is not one for which the Fund is responsible.
Clearly the statute must be read as granting the protection of the Fund only with respect to wrongful conduct of a broker or salesman acting in his capacity as such. See, generally, Note, "The Real Estate Recovery Fund: Constitutional and Procedural Critique of an Illinois Remedy," 56 Chi-Kent L. Rev. 401 (1980); Levine, "Real Estate Recovery Funds  Public Protection against Broker Malpractice," 5 Real Est. L.J. 166 (1976-77); Duty, "Real Estate License Recovery Fund, the California Experience," 7 J. Bev. Hills B.A. 13 (May-June 1973). That conclusion follows not merely as a matter of a common sense reading of the statute but also from the legislative history which, though sparse, indicates an intention to benefit only persons who sustain losses as a result of the licensee's activity as a licensee. Thus, the sponsor's statement attached to the original bill (Senate 1068) cites as an example of the kind of loss to be covered, "lost deposit money or property the licensee may have converted illegally"; the Assembly Committee report describes its amendment to provide a $10,000 limitation for any one claim as being necessary "in view of the fact that the legislation does not differentiate between claims for residential property and for commercial and industrial property," and a statement of the Governor upon his signing of the bill describes it as intended to guaranty "consumer claims," that is, claims of *493 "consumers who, through dealings with a real estate broker or salesman suffer a financial loss.... ."
In order to trigger Fund liability, then, some nexus must exist between the wrongful conduct and licensee's status as a licensee, and Brody does not argue to the contrary. Here Alfieri's principal role was as seller of his own real estate, an activity in which he was not required to be licensed. See N.J.S.A. 45:15-4. If Alfieri were solely acting as seller, the protection of the Fund might well be denied to Brody, notwithstanding that his licensed status may have generated some special confidence in his reliability.
But here Alfieri received the $8,850 portion of the deposit, not as seller but as escrowee, in substitution for his attorney and upon a specific direction and agreement that it was for deposit in his real estate broker's trust account, "to be held by [Alfieri] in trust as the broker in this matter pending closing." Acting as an escrow agent is a frequent and well-recognized undertaking of a broker, and the distinct obligations of that role as performed by a licensee are fixed by statute and regulation. N.J.S.A. 45:15-17(o) specifically authorizes the imposition of sanctions, including revocation or suspension of a license, for
... failure to maintain and deposit in a special account, separate and apart from personal or other business accounts, all monies received by a real estate broker acting in said capacity, or as escrow agent, or the temporary custodian of the funds of others, in a real estate transaction.... [Emphasis supplied]
N.J.A.C. 11:5-1.8, a regulation promulgated by the Commission pursuant to the statute, defines "comingling by a licensee" to include
2. Failure to maintain and deposit promptly in a special account in an authorized financial institution, separate and apart from personal or other business accounts, all monies received by a real estate broker acting in said capacity, or as escrow agent, or as the temporary custodian of the funds of others in a real estate transaction; or
3. Failure to promptly segregate any properties received which are to be held for the benefit of others. [Emphasis supplied]
N.J.A.C. 11:5-1.9 further provides as follows:
(a) No licensee shall accept funds or deposits from a prospective purchaser without ascertaining that there have been established by escrow, or otherwise, *494 adequate precautions to safeguard such funds or deposits where the licensee knows, or conditions are such as to palpably give him reason to know, any facts which would tend to reasonably create a doubt:
1. As to the ability of the seller to perform his contractual obligations; or
2. As to the ability of a seller to return such funds or deposits in the event of the failure of a contingency contained in a real estate contract.
........
(c) Funds or deposits placed in escrow pursuant to this regulation may be held by any person or entity legally authorized to hold funds in that capacity, such as, but not limited to, the real estate broker himself, lawyers or banks.
The statute and regulations thus make clear that a licensee who acts as escrow agent is engaged in a regulated activity as a licensee, subject to sanctions for any misconduct in that capacity. And Brody's escrow instructions, together with his credible testimony that he would not have entrusted his deposit to Alfieri as seller, establish that he relied upon Alfieri's licensed status; that he entrusted his deposit to Alfieri in his capacity as a licensee, and that Alfieri accepted the deposit in that capacity.
The Commission nevertheless contends that the nexus thus shown is insufficient to invoke Fund liability. Relying on case law of other jurisdictions, it urges that Fund guaranty should be available only where the loss arises out of an activity for which a license is required. See, e.g., Buccella v. Mayo, 102 Cal. App.3d 315, 162 Cal.Rptr 369 (D.Ct.App. 1980); Von Thaden v. Arizona State Real Estate Comm'n, 124 Ariz. 394, 604 P.2d 658 (Ct.App. 1979); Lemler v. Real Estate Comm'n, 38 Colo. App. 489, 558 P.2d 591 (Ct.App. 1976). But those cases are of little value here since they interpret statutory language which is significantly more restrictive than our own. See, e.g., Cal.Bus. & Prof.Code § 10471 (recovery only where licensee "performed acts for which a license is required"); Ariz.Rev.Stat. § 32-2186(A)(1) (no fund liability for a licensee's acts "while acting on his own behalf in property owned or controlled by him"); Colo. Rev. Stat. § 12-61-302(1) (recovery only where licensee "performed acts for which a license is required").
*495 Neither the language of the New Jersey statute nor its legislative history suggests that Fund guaranty should be limited to losses arising from an activity for which a license is required. The Fund is intended to protect persons who are victimized by licensed brokers and salesmen acting in their capacities as such. The fact is that Alfieri here misappropriated $8,850 entrusted to him as a licensed broker; to foreclose Brody from recovery against the Fund under these circumstances would be an inappropriately narrow application of the remedy fashioned by the Legislature. Cf. Douglas v. Harris, 35 N.J. 270, 278-81 (1961).

III
The Commission argues that judgment against the Fund should be withheld at the present time because Brody has not shown that he will not be paid out of the assets of Alfieri's estate and that, in any event, he is obligated to pursue other avenues of recovery, including a claim against his or Alfieri's bank for permitting the proceeds of the check drawn to Alfieri's trust account to be deposited in his regular account.
N.J.S.A. 45:15-37 sets forth the preconditions for payment from the Fund:
No claim shall be made for payment from the real estate guaranty fund except upon the reduction to final judgment, which shall include reasonable attorney fees and costs, of a civil action against the broker or salesman, the issuance of a writ of execution thereon and its return unsatisfied in whole or in part and a court order directing the Real Estate Commission to make payment from the fund. No such order shall authorize a payment to the spouse or personal representative of the spouse of the judgment debtor.
Upon delivery by the Real Estate Commission to the State Treasurer of a certified copy of the court order together with an assignment to the Real Estate Commission of the judgment creditor's right, title and interest in the judgment to the extent of the amount of the court order, the State Treasurer shall make payment to the claimant from the real estate guaranty fund.
Little significance can be found in the writ of execution returned unsatisfied on July 29, 1980, in light of the fact that Alfieri was murdered on April 24. No showing has been made of any levy on the estate and, as earlier noted, although Brody *496 has presented his judgment to the executrix, no showing has been made as to whether that judgment will be satisfied in whole or in any part out of estate assets. Under these circumstances, the legislative mandate that recourse against the debtor be exhausted by writ of execution must be said not yet to have been fulfilled.
The suggestion that Brody must as well pursue his remedies, if any, against the banks is without merit: the statute provides for payment following a judgment against the licensee and the issuance and return of the writ of execution only. Had the Legislature intended to require the plaintiff to exhaust all other possible collateral sources it could be expected to have said so. Cf. N.J.S.A. 39:6-70, 71; R. 1:28-3(a)(4); Cal.Bus. & Prof. Code § 10472(e)-(g).
Judgment will therefore be entered in favor of Brody against the Commission in the sum of $8,850; the judgment shall not include any present order to pay, which may later be entered upon proper showing as to the unavailability of assets in the Alfieri estate to satisfy the judgment in whole or in any part. Brody may also apply to include in the judgment an award of reasonable attorneys' fees and costs. N.J.S.A. 45:15-37; R. 4:42-9(b).