The dismissal of plaintiff's complaint is affirmed substantially for the reasons set forth in Judge Eichen's August 25, 1988 opinion.

YVONNE WHARTON, EXECUTRIX OF THE ESTATE OF FRED WHARTON AND DOROTHY SELSER; CHARLES EITNIER AND MARION EITNIER; EDITH B.D. MATHER; RAYMOND L. WALTON; JOHN CLIVER AND JANET CLIVER; ERNEST KELLER; NORA G. PRICE; EVA WOOD, PLAINTIFFS–APPELLANTS, v. HOWARD S. STRAUB, INC., RICHARD H. STRAUB AND DORIS STRAUB, HIS WIFE, DEFENDANTS, AND NEW JERSEY REAL ESTATE COMMISSION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 12, 1989—Decided July 7, 1989.

Before Judges KING, ASHBEY and SKILLMAN.

*Robert A. Gleaner,* argued the cause for appellants (*Lario, Nardi* and *Gleaner,* attorneys).

*Helene S. Henry,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Sarah T. Darrow,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

The plaintiffs, various individuals who invested money with Richard Straub (Straub), to be loaned out as mortgages on real estate and to be used to purchase certain properties, obtained a judgment against his real estate firm and Straub for the fraudulent conversion of these investments. The judgment remained un-

satisfied and the plaintiffs sought to recover from the Real Estate Commission pursuant to the Real Estate Guaranty Fund Act, *N.J.S.A.* 45:15-34 to -42. We affirm the Law Division's grant of summary judgment on behalf of the Real Estate Commission (the Commission) because Straub was not acting within his capacity as a real estate broker or salesman when the wrongful conduct occurred. The plaintiffs failed to show the required nexus between the wrongful conduct and Straub's activity as a licensee.

On October 11, 1983, a consent judgment and payment order was entered into between the plaintiffs, Howard S. Straub, Inc. and Richard H. and Doris Straub in the Chancery Division; the plaintiffs were awarded $127,089.08 in varying amounts for conversion of mortgage investments and nonpayment of secured and unsecured loans. Subsequent to the entry of the consent judgment, the Straubs, as individuals, filed for bankruptcy under Chapter 7. The plaintiffs then filed suit in the Bankruptcy Court requesting that the debt not be discharged due to Straub's fraudulent actions. The plaintiffs also filed complaints in the Chancery Division, in October 1984, against the Straubs and added the New Jersey Real Estate Commission as a defendant, asking for recovery of their losses pursuant to the Real Estate Guaranty Fund Act, *N.J.S.A.* 45:15-34 to -42. On January 14, 1986 the Bankruptcy judge entered an order ruling that the Straubs' debts to the plaintiffs would survive the results of the bankruptcy proceedings. Judge Rossetti then ruled on cross-motions for summary judgment that the plaintiffs could not recover against the Real Estate Guaranty Fund (the Fund) because Straub's fraudulent activities did not arise out of his conduct as a real estate broker.

This is the factual background. Beginning in the 1920's, Howard S. Straub through his real estate agency developed a "full service" business, whereby potential residential purchasers would offer to purchase a property that had been listed by the corporation. As part of this "full service," the corporation would provide the mortgage servicing, including mortgage mon-

ey and preparation of all necessary documents. To provide the mortgage money, the firm solicited money from various investors. The investor would lend the money that he wanted to invest to the firm. In turn, the firm would loan the monies to the real estate buyers.

In later years, the corporation put together consortiums to provide the necessary mortgage funding by obtaining investments from two or more lenders and providing the entire mortgage amount to the borrower. As a receipt for their investments, lenders received promissory notes and letters advising them of the amount of money that was being loaned, the interest rate at which compensation would be made and the amount of mortgage servicing fee that would be retained by the corporation (typically one-half of one percent). Many lenders would reloan or reinvest their money after the mortgages had been paid off. At all times in recent years, the monies paid to the individual investors were paid through the general accounts of Howard S. Straub, Inc.

Howard S. Straub, Inc. initially was licensed as a real estate broker with Howard S. Straub as broker of record. Richard H. Straub, his son, also was employed by the corporation as a broker. On July 1, 1978 Richard Straub became the corporation's broker of record upon the death of his father. At that time, the corporation was doing business in real estate, property management, insurance and mortgages, according to its stationery. The younger Straub was not licensed specifically as a mortgage broker, but was licensed as an insurance broker.

After Straub took over the business, he began to experience financial difficulties. When a mortgage was paid off, instead of repaying the lenders, Straub would use the money for his own purposes. Straub would lead the lenders to believe that the mortgages were still in effect by continuing to send checks to them on a regular basis. Further, Straub began soliciting funds from the investors-plaintiffs for other purposes. Straub obtained an unsecured loan from John and Janet Cliver by a

promissory note for $25,000 at 11% interest, allegedly to finance Straub's purchase of property or a business in Texas. John Cliver testified at deposition that Straub did not appear to be signing the promissory note in the corporation's name. The Clivers loaned additional sums in cash to Straub at increasing interest rates for unspecified purposes. Payments on these notes were made by personal check. Straub never gave any information to the Clivers about how he used the funds, which the Clivers considered an investment.

Charles and Marion Eitnier also made similar loans to Straub. These plaintiffs understood that Straub was to use the loans for purchasing insurance agencies. Charles Eitnier stated on deposition that Straub asked him specifically to make the checks payable to Straub and not the brokerage account. Eitnier further stated that Straub never spoke about or made any arrangements about holding the investments in an escrow or trust account. The interest checks paid to Eitnier were drawn on the brokerage account. Raymond Walton also loaned Straub $15,000 towards the purchase of an insurance company through a promissory note with an interest rate of 20%. He said that he considered the note a personal one to Straub. Walton also gave Straub a personal loan in cash. These plaintiffs received payments of both interest and principal from Straub through May 1982 at which time all payments stopped.

Dorothy McCabe, who worked for the Straubs, stated that between 1960 and 1978 the plaintiffs' monies were kept in the corporation's general account, not its trustee account, and that Straub continued this practice after his father's death. She also stated that checks written to the participating mortgages were written on the general account. The corporation went out of business in 1983; Straub and his wife subsequently filed for bankruptcy.

Judge Rossetti found that Straub functioned in the capacity of a mortgage broker or banker because he was soliciting investment moneys to fund mortgages, which Straub took in his own name. This conduct, according to the judge, was con-

trolled by *N.J.S.A.* 17:11B–1 to –20, the Mortgage Bankers and Brokers Act, and was "probably not" permissible conduct because Straub did not have a mortgage broker's license and was not exempt from that Act. The judge concluded that the Fund was never intended to include the conduct of a mortgage broker who happened also to be a real estate broker, but rather was intended to protect purchasers and sellers of real estate who did business with brokers within the ambit of the traditional broker-client relationship arising from real estate transactions.

The plaintiffs urge that there was a "nexus" between Straub's acts as a real estate broker and what he was doing with the mortgage money that he was collecting and extending to potential buyers of real estate. The plaintiffs contend that "but for" the fact that Straub was selling real estate, Straub would not have had the opportunity to obtain the investors' monies. They further assert that the money was used only in connection with properties being sold through Straub.

The defendant Commission contends that to permit recovery on all losses caused by the dishonest business conduct of persons holding New Jersey real estate licenses would result in recovery from the Fund by a "plethora" of general and business creditors regardless of the context in which the debt arose and regardless of the relationship between the creditor and the broker. The defendant contends that the "nexus" claimed by the plaintiffs was only slight at best. The defendant also asserts that the Law Division judge correctly concluded that the business of residential mortgage financing is an activity outside the scope of a real estate broker's license. Therefore, according to the defendant, because Straub was in the business of originating residential mortgages, he was engaged in mortgage banking, subject to regulation by the Department of Banking, not the Real Estate Commission.

In granting the defendant's motion for summary judgment, the judge stated:

The question presented by these motions is whether that conduct is the conduct of a real estate broker envisioned by 45:15–34 and under which by

reason of the embezzlement of the funds by Straub these Plaintiffs can recover from the State Treasurer and the Real Estate Commission.

It's the judgment of this Court that they cannot. The functions of Straub in the capacity that this case is concerned with was the function of a mortgage broker or banker in that he was soliciting investment funds with the purpose of funding mortgages which mortgages he took in his own name and which collections he received and remitted to his investor persons, these Plaintiffs.

. . . .

It's my belief that 45:15-34 was never intended to include that kind of conduct by a mortgage broker who happened to be a real estate broker as well. And in fact, the intent of 45:15-34 was to protect purchasers or sellers of real estate who did business with brokers and as a result of that had their funds embezzled or converted or unlawfully taken.

### *N.J.S.A.* 45:15–34 provides:

A real estate guaranty fund is established as a special trust fund to be maintained by the State Treasurer and administered by the New Jersey Real Estate Commission in accordance with the provisions of this act to provide a fund from which recovery may be obtained by any person aggrieved by the embezzlement, conversion or unlawful obtaining of money or property by a licensed real estate broker or real estate salesman or an unlicensed employee of a real estate broker; provided, however, that the amount of such recovery to be obtained by any person shall not exceed $10,000.00 for each claim filed.

The legislation was designed to assist a person who receives a valid judgment in any court of competent jurisdiction against a real estate broker or real estate salesman for the return of moneys or property when the judgment is unsatisfied in whole or in part. Senate Labor, Industry and Professions Committee, Sponsor's Statement, No. 1068, L. 1976, c. 112.

The Mortgage Bankers and Brokers Act applies to mortgage loans secured by a first mortgage on real property used principally for dwelling purposes. *N.J.S.A.* 17:11B–1a. A "mortgage banker" is one who for compensation or gain, or in the expectation of such, either directly or indirectly originates, acquires or negotiates mortgage loans in the primary market. *N.J.S.A.* 17:11B–1c. A "mortgage broker" differs in that he or she places or sells for others, or offers to negotiate, place or sell for others a mortgage loan. *N.J.S.A.* 17:11B–1d. A person licensed as a real estate broker or salesman pursuant to *N.J. S.A.* 45:15–1 to –42, and not engaged in the business of a mortgage banker or broker, is exempt from the requirements of the Act. *N.J.S.A.* 17:11B–2d. A license is required in order

to act as a mortgage banker or mortgage broker. *N.J.S.A.* 17:11B–3. Thus, the Department of Banking has the authority to regulate real estate brokers in connection with their business activities as licensed mortgage brokers and mortgage bankers. *Mortg. Bankers Ass'n v. N.J. Real Estate Com'n,* 102 *N.J.* 176, 183–184 (1986).

One reported case has considered the applicability of the Fund. In *Brody v. Alfieri,* 179 *N.J.Super.* 485 (Ch.Div.1981), the plaintiff sought to rescind a real estate purchase contract and to recover the deposit which he had paid. In addition to naming the seller, the plaintiff joined the Commission, seeking payment from the Fund of an unpaid judgment against the defendant who held a broker's license. A default judgment was entered against the defendant for $9,758, which was not satisfied. The Commission denied Fund liability, asserting that his role in the transaction was as a seller rather than as a licensed broker.

In October 1979, the parties in *Brody* had agreed orally on the sale and purchase of a condominium which was owned by defendant. *Id.* at 488–489. On November 2, 1979 the plaintiff gave the defendant a check for $150 payable to "Joseph Alfieri," as opposed to "Joseph Alfieri Realty," as a deposit pending execution of the contract. On November 7, 1979 the parties entered into a written contract for $90,000 which provided for a $9,000 deposit to be held by the defendant's attorney until closing. The contract included a provision waiving payment of a real estate commission as a result of the transaction and said that if such a commission were earned it would be the defendant's responsibility. The plaintiff, an attorney who prepared the contract, delivered a letter to the defendant at the time of execution stating that if the defendant had not retained an attorney, the plaintiff would deposit the check in defendant's real estate broker's trust account to be held by him in trust as the broker pending closing. The defendant orally agreed to this arrangement and the plaintiff delivered a check to him for the deposit's balance; this check was not deposited in the trust

account, but rather in the regular checking account of Joseph Alfieri Realty. The defendant dissipated the entire balance of funds in that account. In January 1980, after conducting a title search, the plaintiff learned that the deposit was not in escrow and was not available.

Judge Gaulkin found that the defendant was a licensed real estate broker whose wrongful conduct was subject to guaranty by the Fund. The pertinent issue concerned whether the Fund was bound to guaranty the loss the plaintiff sustained. Judge Gaulkin initially noted: "Clearly the statute must be read as granting the protection of the Fund only with respect to wrongful conduct of a broker or salesman acting in his capacity as such." *Id.* at 492. Therefore, to trigger Fund liability, there must be some nexus between the wrongful conduct and the licensee's status as a licensee. *Id.* at 493. The judge noted that if the defendant had been acting solely as the seller, the court might have denied the Fund's protection to the plaintiff because the defendant did not need a license to sell his own real estate. However, because the defendant received the deposit, not as a seller but as an escrowee, a broker's frequent and well-recognized function, the defendant was subject to sanctions for any misconduct in that capacity, *Id.* at 493–494. The judge also rejected the Commission's argument that the Fund guaranty should be available only where the loss arises out of an activity for which a license is required, holding that neither the statute's language nor its legislative history suggests that the Fund guaranty should be limited to such losses alone. *Id.* at 494–495.

There are some similarities and some dissimilarities between *Brody* and the case before us. In both cases, checks were made out to the broker personally rather than to the company. Further, the broker put the deposit(s) in his personal account not in a trustee or escrow account. However, the relationship in *Brody*, as opposed to the one in the present matter, was a true broker-client relationship involving the sale of property (a condominium apartment), albeit the broker also was the seller.

Another crucial distinction is that the broker in *Brody* was acting as escrowee, supposedly holding the deposit in trust pending closing. The broker was therefore acting as an escrow agent, "a well-recognized undertaking of a broker," 179 *N.J.Super.* at 493, and, consequently, within his capacity as broker. Finally, as the *Brody* court noted, a "common sense reading" of the statute and the sparse legislative history "indicates an intention to benefit only persons who sustain losses as a result of the licensee's activity as a licensee." *Id.* at 492. Here Straub was functioning much more like a mortgage broker, although unlicensed as such, than as a real estate broker, the liability of which is comtemplated by the Guaranty Fund statute. The plaintiffs' losses did not result from Straub's activity as a real estate licensee. We thus conclude that the plaintiffs cannot benefit from the Fund.

However, *N.J.S.A.* 45:15–3 does include within its definition of a "real estate broker" a person who "offers or attempts or agrees to negotiate a loan secured or to be secured by mortgage." In *George H. Weinrott & Co. v. Burlington Housing Corp.*, 22 *N.J.Super.* 91, 98–99 (Ch.Div.1952), the court held that a firm contracting to place mortgages for a housing corporation for a commission of 2% was engaged in the business of a real estate broker, even though not licensed as such. Nevertheless, because the Mortgage Bankers and Brokers Act was enacted in 1981, and because the Real Estate Act does not include within its definition those who originate mortgages, as opposed to those who broker mortgages, these considerations ultimately do not support the plaintiffs' contention.

In the crucial aspect of the analysis, we must focus on Straub's status as licensed broker as related to the transactions under scrutiny. Straub's family firm and his background were that of real estate brokers in the community. But the critical transactions involved mortgage banking, *N.J.S.A.* 17:11B–1(c), rather than traditional real estate transactions. As noted in *Brody*, to trigger Fund liability, there must be some nexus between the wrongful conduct and the licensee's status as

licensee. 179 *N.J.Super.* at 493. A superficial or cursory reading of the statute, *N.J.S.A.* 45:15–34, perhaps suggests that it is broad enough to encompass plaintiffs' claims. The statute proves recovery for "any person aggrieved by the embezzlement, conversion or unlawful obtaining of money or property to a licensed real estate broker." However, in construing a statute, a court must give effect to the Legislature's intent. *Coletti v. Un. Co., C. Freeholders*, 217 *N.J.Super.* 31, 35 (App.Div. 1987). Statutes are to be read sensibly, with the purpose and reason for the legislation controlling, rather than to be construed literally. *Suter v. San Angelo Foundry & Machine Company*, 81 *N.J.* 150, 160 (1979).

Both the *Brody* court and the Law Division judge in the present matter found that the Legislature intended to benefit persons who sustained losses resulting from a real estate broker's activity as broker. 179 *N.J.Super.* at 492. The Legislature clearly did not intend to provide for recovery for any loss suffered as a result of the malevolent conduct of a real estate broker engaging in any type of commercial activity. We find that plaintiffs have failed to establish a sufficient nexus between Straub's status as a real estate broker and his actions as a mortgage broker or banker to justify Guaranty Fund liability.

Affirmed.