253 N.J. Super. 137 (1992)
601 A.2d 243
MIDLANTIC NATIONAL BANK, A NATIONAL BANKING CORPORATION, PLAINTIFF-APPELLANT,
v.
THE PEERLESS INSURANCE COMPANY AND COMMISSIONER OF BANKING OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 1991.
Decided January 15, 1992.
*138 Before Judges BILDER, STERN and KEEFE.
*139 Joy H. Sperling argued the cause for appellant (Pitney, Hardin, Kipp & Szuch, attorneys; J. Michael Nolan, Jr. and Joy H. Sperling, on the brief).
Thomas J. Bradley argued the cause for respondent The Peerless Insurance Company (Lavin, Coleman, Finarelli & Gray, attorneys, Thomas J. Bradley, on the brief).
Sharon L. Young, Deputy Attorney General, argued the cause for respondent Commissioner of Banking of the State of New Jersey (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Sharon L. Young, on the brief).
The opinion of the court was delivered by BILDER, J.A.D.
This appeal involves the Mortgage Bankers and Brokers Act, an act for the regulation and licensing of mortgage bankers and brokers, N.J.S.A. 17:11B-1 et seq., and more particularly the proper construction of that part of the Act which requires that the licensees be bonded, N.J.S.A. 17:11B-8. We are asked to determine whether the protections afforded by the bond provisions of the Act apply only to consumers with whom the licensees do business or reach the claims of the licensees' business creditors. The matter comes to us after cross-motions for summary judgment. There are no disputes as to factual issues. See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954). The issue is purely one of statutory interpretation.
N.J.S.A. 17:11B-8 provides:
A licensed mortgage banker and mortgage broker, prior to doing business, shall obtain a bond in an amount and form prescribed by regulations of the commissioner but not less than $25,000.00. The bond shall be obtained from a surety company authorized by law to do business in this State. In lieu of individual bonds, a mortgage banker or mortgage broker may procure a blanket bond to cover all employees licensed under the provisions of this act in an amount as prescribed by regulation of the commissioner. The bond shall run to the State for the benefit of any person injured by the wrongful act, default, fraud or misrepresentation of the mortgage banker, broker or solicitors. No *140 bond shall comply with the requirements of this section unless the bond contains a provision that it shall not be cancelled for any cause unless notice of intention to cancel is filed in the Department of Banking at least 30 days before the day upon which cancellation shall take effect.
The discrete issue before us is whether a business creditor of a mortgage banker, such as plaintiff Midlantic National Bank, is a "person" within the meaning of the sentence: "The bond shall run to the State for the benefit of any person injured by the wrongful act, default, fraud or misrepresentation of the mortgage banker, broker or solicitors."

I.
The case arises from the operations of Dominion Mortgage Company, Inc., a mortgage banker licensed under the Act which ceased its mortgage banking operations in December 1988. On April 15, 1987, as required by N.J.S.A. 17:11B-8, Dominion had filed a surety bond issued by defendant Peerless Insurance Company in the sum of $35,000. Under the bond, Peerless "as surety [was] held and firmly bound unto the State of New Jersey for the use and benefit of any person injured by the wrongful act, default, fraud or misrepresentation of a mortgage banker, broker or solicitor in the principal sum of $35,000."
As a "mortgage banker" Dominion, either directly or indirectly, originated, acquired or negotiated mortgage loans in the primary market, i.e. loans to owners of primarily residential property secured by a first mortgage. See N.J.S.A. 17:11B-1a, b, c.[1] Its general business was, as aptly described by Judge Pressler, to grant loans secured by a mortgage and then sell the obligation at a discount. See Mortgage Bankers Ass'n v. *141 N.J. Real Estate Com'n, 200 N.J. Super. 584, 589, 491 A.2d 1317 (App.Div. 1985), rev'd 102 N.J. 176, 506 A.2d 733 (1986).
The mortgage origination business of mortgage companies is financed by their equity capital and by short-term loans from commercial banks. Commercial banks often supply short-term funds under a "warehousing" agreement whereby the mortgage company obtains a revolving line of credit from the bank and as individual mortgage loans are closed, the mortgage company pledges the mortgages as collateral security with the bank, which holds the mortgages for eventual sale and reassignment to long-term lenders. Law of Mortgages, 29 New Jersey Practice § 6 (1991) at pocket part 9.
Dominion obtained its financing through a Mortgage Warehouse and Security Agreement it entered into with Midlantic in December 1984. Midlantic contends that between December 1986 and September 1988 Dominion presented it with some 51 fraudulent mortgage transactions in respect of which it received advances of $6,234,212. In January 1989, some three weeks after Dominion ceased operations, Midlantic sought to reach the Peerless bond in partial satisfaction of the Dominion indebtedness. After the claim was rejected as not being a consumer claim, Midlantic brought a declaratory judgment action against Peerless and the Commissioner of Banking, in which it sought a declaration that the Peerless bond was available to satisfy its claim as "a person injured by the wrongful act, fraud or misrepresentation" of Dominion and that it was entitled to compensation under that bond. Midlantic appeals from an order of the Law Division finding that it is not a claimant under N.J.S.A. 17:11B-8 and denying it any recovery under the bond.

II.
In an oral opinion of November 9, 1990, after examining the Act and the limited legislative history available to him, the trial judge found the "touchstone [of the Act] is the protection of the consumer, the consuming public that is dealing with these mortgage bankers...." He concluded that the bond provision of § 8 was for the benefit of those consumers. He said the thrust of the statute is to protect the consumer and by the bond provision to give the consumer redress that might otherwise *142 not be available. He found the Act to be a remedial statute intended to protect consumers, not business creditors. He accordingly granted defendants' motions for summary judgment, denied Midlantic's motion, and declared the bond was not available to satisfy Midlantic's claim as a business creditor of Dominion. We agree.

III.
In construing this statute, we must be mindful of our obligation to read it in a common-sense manner which advances the legislative purpose. See Cressey v. Campus Chefs, Div. of CVI Service, Inc., 204 N.J. Super. 337, 342-343, 498 A.2d 1274 (App.Div. 1985). "Statutes are to be read sensibly, with the purpose and reason for the legislation controlling, rather than to be construed literally." Wharton v. Howard S. Straub, Inc., 235 N.J. Super. 179, 189, 561 A.2d 1169 (App.Div. 1989).
As is usually the case in New Jersey, the legislative history for the Act is sparse. See Matter of Estate of Hersh, 195 N.J. Super. 74, 78, 477 A.2d 1286 (App.Div. 1984), certif. den. 99 N.J. 185, 491 A.2d 689 (1984). A source which is sometimes helpful is the Statement attached to a bill. See Marotta v. Burgio, 185 N.J. Super. 172, 175-176, 447 A.2d 937 (Law Div. 1982). In this case, the Statements attached to the bills as originally introduced in both houses are identical and principally descriptive. Statement to S. 975 of 1980; Statement to A. 755 of 1980. They do, however, make the general comment that "this bill provides for the licensing and regulation of mortgage bankers, mortgage brokers and mortgage solicitors by the Commissioner of Banking." Ibid. And they do describe the bills as "prohibit[ing] several specific business practices which are deemed inconsistent with the public interest." Ibid. After the bill was modified by the Assembly Banking and Insurance Committee to deal more specifically with the fees charged to borrowers, the Statement was enlarged to make reference to the legislature's public hearings.

*143 [The legislative committees] heard testimony that in some cases mortgage commitments were slow in being issued by these lenders, closing dates were repeatedly postponed, excessive and extraordinary fees were charged at closing, and mortgages were poorly serviced. In the face of these complaints, the Department of Banking was unable to act because it had no jurisdiction, and individuals who were aggrieved by some of these practices had no recourse. [Assembly Banking and Insurance Committee Statement to A. 755 of 1980]
It added this additional description to the bill:
The legislation regulates certain trade practices, including advertising, preparation of mortgage documents, the taking of bonuses or commissions by other than licensees, and the disbursement of funds. The legislation also deals with the question of the fiduciary responsibilities of a licensee with respect to the handling of money, personal property, or documents. [Ibid.]
While we recognize that individual statements made by interested parties at public hearings are doubtful evidence of legislative intent, it is of some use to note the comment of the Chairman of the Senate Labor, Industry and Professions Committee and chief sponsor of the bill in that body, that the intent of the proposed act is to reach fraudulent or anticonsumer practices. Senator Bedell, Hearings on S. 975 and A. 755, March 19, 1980, page 19. See Deaney v. Linen Thread Co., 19 N.J. 578, 584-585, 118 A.2d 28 (1955).
The principal source of intention however must, as is usually the case, be the legislation itself, read as a whole. From such an examination, we are fully persuaded that the Act clearly seeks to regulate dealings between brokers and borrowers and is, as Senator Bedell said, intended to protect the consumer. Rather than recite a section by section examination of the many provisions which regulate the conduct of the licensees and protect the mortgage borrower, it is sufficient to note the analysis made by Judge Pressler in Mortgage Bankers Ass'n v. N.J. Real Estate Com'n, supra 200 N.J. Super. at 589-592, 491 A.2d 1317. As a remedial act it should be construed liberally to protect the mortgage borrowers. See State v. Meinken, 10 N.J. 348, 352, 91 A.2d 721 (1952). Viewed in these contexts, we entertain no doubt that the legislature intended the bond to benefit borrowers who sustain losses resulting from a mortgage banker's or broker's activity as banker or *144 broker. To bring into play the bond liability, there must be a nexus between the wrongful conduct and the licensee's status as a licensee. See Brody v. Alfieri, 179 N.J. Super. 485, 493, 432 A.2d 567 (Ch.Div. 1981).

IV.
In its brief on appeal, Midlantic refers to a similar dispute with the Commissioner involving a bond issued by First Indemnity of America Insurance Company and a settlement which recognized the paramount claims of consumers, provided for the payment of those claims in full and provided for the payment of the balance of the bond proceeds to Midlantic. The use of the prior settlement as contended by Midlantic is improper. Unless a settlement contains an agreement that it should be otherwise treated, it is without prejudice. The policy in favor of settlement requires that this be so. Lesniakowski v. Amerada Hess Corp., 225 N.J. Super. 416, 421-422, 542 A.2d 940 (App.Div. 1988); Bandai America Inc. v. Bally Midway Mfg. Co., 775 F.2d 70, 74 (3d Cir.1985) ("settlement agreements involve claim preclusion, not issue preclusion").
Additionally, we note that Midlantic's position with respect to the earlier settlement, if accepted, leads to a result contrary to that which it espouses. In that earlier settlement, and again before us, Midlantic accepted the notion that its position was junior to that of the consumer creditors. If Midlantic's interpretation of the statute were correct, there would be no basis for such priorities  they are clearly not provided by the statute.[2]
Affirmed.
NOTES
[1] A mortgage loan means any loan secured by a first mortgage on real property on a one to six family dwelling, a portion of which may be used for nonresidential purposes. N.J.S.A. 17:11B-1a. A primary market is the market wherein mortgage loans are originated between a lender and a borrower. N.J.S.A. 17:11B-1b.
[2] In view of our rejection of Midlantic's position that it is a person within the meaning of the Act, we need not consider its unjust enrichment claim. If the bond is not for the benefit of Midlantic, the denial of payment cannot be characterized as unjust. Moreover, we note that the bonding company's premiums are based upon anticipated claims experience so that a finding of non-liability in a particular case should reflect the premium and the risk and ordinarily is not a windfall.