295 N.J. Super. 5 (1996)
684 A.2d 506
EDWARD ADAMS AND BARBARA ADAMS, H/W, PLAINTIFFS-RESPONDENTS,
v.
COOPER HOSPITAL AND KIM HOLCOMB, R.N., DEFENDANTS-APPELLANTS, AND ANTHONY MURE, M.D., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1996.
Decided November 13, 1996.
*8 Before Judges MUIR, Jr., KLEINER, and BILDER.
Parker, McCay & Criscuolo, for appellants (Stacy L. Moore, Jr., of counsel; Brooke D. Schmoll, on the brief).
Joseph P. Briglia, for respondents.
The opinion of the court was delivered by MUIR, Jr., J.A.D.
In this nursing malpractice action, the jury awarded Edward Adams (plaintiff) $1,500,000 and his wife, Barbara Adams, $160,000 on her per quod claim. Defendants appeal the ensuing judgment. They argue the trial court committed reversible error when it refused to instruct the jury on the right of a nurse to exercise her medical judgment in the treatment of a patient. They also contend, because the plaintiff's Personal Injury Protection (PIP) insurer paid the stipulated $154,380 in medical malpractice expenses, N.J.S.A. 39:6A-12 barred the admissibility of all medical expenses. Thus, they argue the trial court committed reversible error when it instructed the jury pursuant to the collateral source rule. Finally, they contend the damage awards were so excessive as to require a new trial on both liability and damages. We affirm.

I.
The trial court instructed the jury on the general standard of care required of a medical provider as defined in Schueler v. Strelinger, 43 N.J. 330, 344-45, 204 A.2d 577 (1964). However, the court refused defendants' request to instruct that a medical provider "must be allowed a wide range in the reasonable exercise of judgment" as to the course of treatment taken. Ibid. Defendants find error in the refusal to charge the medical judgment rule. We disagree.
The medical judgment rule does not apply to all medical malpractice actions. Schueler set its parameters. "[W]hen a surgeon *9 selects one of two courses, ... either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued." Id. at 346, 204 A.2d 577. The Schueler Court emphasized that, when a matter exists "about which there are differing schools of medical opinion ... the plain inference is that the matter must be left to the good faith judgment of the experienced attending surgeon." Ibid. The Court relied on this principle to absolve the defendant doctor of liability because he chose between two medically confirmed alternatives. Those alternatives were to operate quickly and risk the patient's bleeding to death because of a blood-clotting problem or to take additional time to improve the blood's clotting and risk the spread of her possible cancer. These Hobson's choice circumstances induced the Court's reversal of a judgment against the doctor.
Here, no such choicelessness existed. The issue before the jury was whether Kim Holcomb, R.N., (defendant) had the duty to constantly monitor her patient, the plaintiff, during the time she was in charge of his care.
Plaintiff sustained serious injuries in an automobile accident. The hospital diagnosed his injuries as several broken ribs, a punctured lung, and a suspected heart injury. Hospital personnel placed him in the Trauma Intensive Care Unit. Approximately fifteen days after admission, plaintiff's condition stabilized. He was then transferred to a private room in a medical surgical ward where he came under the defendant's care.
On May 15, 1990, shortly after admission to the surgical ward, plaintiff, who had a trache tube inserted in his throat, was having difficulty breathing and was coughing up thick yellow mucous. He was unable to speak. His temperature went up to 101.4° , and his vital signs also deteriorated. His blood pressure went to 210 over 100. A trauma physician ordered a blood gas test, medicine, and application of nitro paste to open up blood vessels. The nurse's hospital notes, recorded after her conversation with the trauma physician, indicated she would monitor the plaintiff.
*10 Defendant claimed she complied with the trauma doctor's directions. She ordered the test and administered the paste and medicine. She also suctioned mucous from plaintiff's throat. Thereafter, she left plaintiff alone for thirty minutes or more. During that time, plaintiff began to choke on mucous accumulated at the trache tube. Unable to speak, he attempted to use a bedside call button designed to summon a nurse. His effort to do so led to his falling out of bed. The defendant and the trauma doctor found plaintiff lying on the floor surrounded by his urine and fecal matter. Subsequent suctioning of plaintiff's throat, according to the trauma doctor, brought out a "copious" amount of mucous. Plaintiff sustained a comminuted fracture of his left hip and a head trauma as the result of the fall. The hospital immediately transferred plaintiff back to the trauma unit and placed him on mechanical ventilation.
Plaintiff's nursing expert and defendant's nursing expert differed over the need to constantly monitor plaintiff. Emphasizing plaintiff's dangerously increased vital statistics and his inability to communicate, plaintiff's expert testified defendant deviated from the required standard of care when she left plaintiff alone for thirty minutes or more. The expert stated plaintiff needed someone to be with him constantly until he became stabilized. The expert did state that nurses "have the ability to make judgments," but defense counsel conceded she did not use the word judgment in rendering her opinion. We conclude the expert used the word to reflect on the general ability of nurses to make judgments rather than including judgment as part of her opinion on the duty of care required in this instance.
On the other hand, the defense expert concluded no deviation occurred. She opined that defendant did all that was required of her. Nonetheless, she conceded the instability of plaintiff's vital signs made him a high-risk patient. Reviewed in its entirety, the defense expert's testimony reflects a conclusion defendant was not required to continuously monitor the plaintiff, so she did not deviate from the attendant standard of care. Her testimony *11 focused on the proper standard governing defendant's conduct, not the exercise of judgment between two accepted schools of medical opinion.
Under the circumstances, we are satisfied the trial court did not err in refusing to instruct the jury on the medical judgment rule. The charge, viewed in its entirety, clearly and completely sets forth the governing principles of law. See Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 570, 512 A.2d 507 (App. Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986). The instruction could not have confused or misled the jury. Id. at 571, 512 A.2d 507. Moreover, even if errant, the charge was not clearly capable of producing an unjust result. R. 2:10-2.

II.
We resolve now the issue concerning the admissibility of the $154,380 in medical expenses stipulated to be attributable to the medical malpractice claim. Due to the fact plaintiff's initial hospitalization stemmed from the automobile accident and the fact this court held plaintiff was entitled to PIP benefits, see Adams v. Keystone Ins. Co., 264 N.J. Super. 367, 370-73, 624 A.2d 1008 (App.Div. 1993), defendant claims N.J.S.A. 39:6A-12 barred the admissibility of all medical expenses arising out of plaintiff's hospitalization because the insurer paid all plaintiff's medical expenses. Plaintiff, on the other hand, argues the trial court properly applied the collateral source rule embodied in N.J.S.A. 2A:15-97 because N.J.S.A. 39:6A-12 curtails medical expense evidence only when they relate to automobile personal injury claims. We sustain the trial court's application of the collateral source rule.
N.J.S.A. 39:6A-12 provides in part:
[E]vidence of the amounts collectible or paid pursuant to [N.J.S.A. 39:6A-4 and 39:6A-10], to an injured person ... is inadmissible in a civil action for recovery of damages for bodily injury by such injured person.
The statute is designed to prevent double recovery by a plaintiff eligible for PIP benefits. See, e.g., Rybeck v. Rybeck, 141 N.J. Super. *12 481, 508, 358 A.2d 828 (Law Div. 1976), appeal dismissed, 150 N.J. Super. 151, 375 A.2d 269 (App.Div.), certif. denied, 75 N.J. 30, 379 A.2d 261 (1977). The statute reflects legislative awareness of the need to preclude double recovery in circumstances where a PIP insurer has no right of subrogation for PIP benefits paid. See Lattimer v. Boucher, 189 N.J. Super. 33, 38, 458 A.2d 528 (Law Div. 1983). It is part of an overall legislative design to curtail litigation in the area of automobile personal injury claims. See Fitzgerald v. Wright, 155 N.J. Super. 494, 497, 382 A.2d 1162 (App.Div. 1978).
N.J.S.A. 2A:15-97, commonly referred to as the collateral source rule, in relevant part provides:
In any civil action brought for personal injury or death, except actions brought pursuant to ... [N.J.S.A. 39:6A-1 to -35], if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits ... shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff.... Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
This statute has goals similar to those of N.J.S.A. 39:6A-12. It fosters the state's public policy against double recoveries by preventing a claimant from receiving excess damages and by relieving insurers and defendants from having to pay plaintiff damages above plaintiff's actual losses. See Kiss v. Jacob, 268 N.J. Super. 235, 249, 633 A.2d 544 (App.Div. 1993), rev'd on other grounds, 138 N.J. 278, 650 A.2d 336 (1994).
N.J.S.A. 39:6A-12 is applicable only to automobile personal injury litigation. It does not apply to other types of personal injury litigation, such as the medical malpractice claims of this case. The fact that plaintiff's original hospitalization stemmed from an automobile accident does not make the proscriptions of N.J.S.A. 39:6A-12 applicable to medical expenses attributable to the malpractice that ensued. Logic belies any other conclusion.
Statutes must be read sensibly so as to provide interpretations consistent with their legislative purpose and to avoid unreasonable *13 results. See, e.g., State v. Gill, 47 N.J. 441, 444, 221 A.2d 521 (1966); Wharton v. Howard S. Straub, Inc., 235 N.J. Super. 179, 189, 561 A.2d 1169 (App.Div. 1989). The legislative design of both statutes is to avoid double recovery. The trial court's interpretation is consistent with both purposes. Moreover, that interpretation avoids the aberrant result a contrary construction would produce. It avoids creating a rule of law that a medical malpractice plaintiff who ordinarily is entitled to introduce relevant evidence of his or her medical expenses for consideration by the jury would not be able to do so in those instances where medical malpractice occurs during a hospitalization precipitated by a PIP-covered automobile accident. The anomaly of such a result evinces the fallacy of defendant's contention.
To reiterate, we find no error in the trial court's reliance on the collateral source rule. The proscription of N.J.S.A. 39:6A-12 applies only to medical expenses that have a direct relationship to automobile personal injury claims. The proscription does not apply to medical expenses that eventuated from the medical malpractice that occurred after the hospitalization for the automobile personal injuries even though a PIP insurer reimbursed plaintiff for those expenses.

III.
We turn now to defendant's contention the jury verdict was so excessive, in absence of a lost wage claim, the trial court should have either granted a remittitur or a new trial on liability and damages. We reject the contention.
Judicial review of a jury damage award for alleged excessiveness is carefully circumscribed. The scope of review is generally the same for trial or appellate court. Baxter v. Fairmont Food Co., 74 N.J. 588, 600, 379 A.2d 225 (1977); Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970). The scope entails the premise that a jury verdict is entitled to "very considerable respect." Baxter, supra, 74 N.J. at 597, 379 A.2d 225. Courts should not interfere with the quantum of *14 damages assessed by a jury unless it is so disproportionate to the injuries as to shock the court's conscience and to clearly convince the court that to sustain the award would be manifestly unjust. Id. at 596, 379 A.2d 225. When such a conclusion is reached, other considerations arise. Remittitur may be utilized to avoid a new trial. See Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 231, 276 A.2d 861 (1971). Alternatively, a new trial on damages may be ordered, but it is the sole relief if the jury clearly and properly decided the liability issue. Ibid. Only when the record discloses clear and convincing evidence that "plaintiffs' verdicts were so grossly excessive as to infect the entire result and to visit a manifest injustice upon the defendant if allowed to stand" is the remedy an entirely new trial. Taweel, supra, 58 N.J. at 231, 276 A.2d 861; see also R. 4:49-1; Baxter, supra, 74 N.J. at 596, 379 A.2d 225.
We are satisfied the damages awarded are not so disproportionate to the injuries as to shock our conscience or to convince us a manifest injustice has occurred. Accordingly, we conclude the liability verdict and damage awards should not be disturbed.
The evidence presented discloses plaintiff fell from his hospital bed, sustained a comminuted fracture to his left hip, and sustained a head trauma which caused temporary intermittent dizziness. He lay on the ward room floor, in his body discharges, for some period of time before being helped by hospital personnel. Returned to the trauma intensive care ward, he lived with the pain of the fractured hip for several days before it was treated. He underwent three separate operations in an effort to first repair the hip and then replace it. He now has a total hip replacement that will need to be redone in twelve to fifteen years. During his projected fifteen-plus year life expectancy, plaintiff's expert stated he would continue to experience pain in his hip and lower back. The expert also stated plaintiff's condition will only deteriorate, it will not improve.
Plaintiff testified he has trouble going up and down stairs, sitting down, standing up, and walking. He needs a cane to walk. *15 His left leg is shorter than his right. He also has difficulty performing normal daily activities, including putting on his socks, shoes, and pants.
These facts reflect considerable pain and suffering both before, during, and after the corrective hip surgery. They demonstrate significant permanent disability that projects the need for future expense to alleviate the injuries and disability. They also project significant deterioration in the quality of plaintiff's lifestyle. Viewed in that context and recognizing that reasonable compensation is left to the impartial conscience and judgment of jurors, see Botta v. Brunner, 26 N.J. 82, 94, 138 A.2d 713 (1958), we are satisfied the jury awards should not be disturbed. See also Theobold v. Angelos, 40 N.J. 295, 304, 191 A.2d 465 (1963) (delineating factors to be considered in jury awards of reasonable compensation); Eyoma v. Falco, 247 N.J. Super. 435, 450, 589 A.2d 653 (App.Div. 1991) (reasonable damages include loss of quality of life precipitated by injuries sustained).
The judgment under appeal is affirmed.