636 A.2d 1066

EDWARD ROBINSON, APPELLANT, v. NEW JERSEY
DEPARTMENT OF HUMAN SERVICES, DIV. OF
FAMILY DEVELOPMENT, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 14, 1993—Decided January 26, 1994.

Before Judges DREIER, BROCHIN and KLEINER.

*Robert M. Pallitto* argued the cause for appellant (Passaic County Legal Aid Society; *Mr. Pallitto,* on the brief).

*Fred DeVesa,* Acting Attorney General, attorney for respondent (*Joseph L. Yannotti,* Assistant Attorney General, of counsel; *James T. Hill, Jr.,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

DREIER, J.A.D.

Edward Robinson appeals from an order of the Director of the Division of Family Development terminating his general assistance benefits for a period of ninety days as a result of his noncompliance with the rules governing the "workfare" program. Appellant's general assistance benefits were conditioned upon his continued participation in the workfare program which in his case required that he work at least three days a month in an approved work program. *See* former *N.J.S.A.* 44:8–114 (prior to the amend-

ments of *L.*1991, *c.* 523, § 14, originally effective July 1, 1991, but postponed to July 1, 1992).

Under appellant's workfare program he was required to report to the Paterson Yard for a work assignment on a recycling truck at 7:00 a.m. on August 12, 1992. Initially, appellant claimed that he was only ten minutes late, but later admitted "I was just late. I was trying to comply. I'm sorry. I was late. My alarm clock didn't go off. That's all I could tell you." He did not arrive at the site until shortly after 8:00 a.m. Although appellant was still willing to work on the recycling trucks, they had already left. Appellant was therefore directed to obtain another work assignment. Instead of reporting to the General Assistance Employability Program Office, within walking distance of the yard, appellant reported to the Paterson Welfare Office and met with his caseworker. She terminated appellant's public assistance for a period of ninety days. *See* former *N.J.S.A.* 44:8–114 authorizing, and *N.J.A.C.* 10:85–3.2(g)7ii(1) specifying, a ninety-day penalty. These sections are discussed in more detail *infra.*

Appellant appealed the notice of termination and requested a local hearing. On August 25, 1992 appellant was heard by the Municipal Welfare Department and the termination was affirmed, effective September 1st. Appellant then requested a State-level emergency hearing which was held September 10, 1992 by an administrative law judge who recommended affirmance of the decision. Appellant filed exceptions to this decision, but on September 28, 1992 the Director of the Division of Family Development in the Department of Human Services affirmed the termination. We are informed that appellant's benefits at the time were $140 per month, and the amount in controversy therefore is $420.[1] The principles involved, however, far exceed this sum.

---

[1] The maximum benefit for those deemed "employable" is $140/month. *N.J.A.C.* 10:85–4.1 Schedule II. At oral argument, in response to our inquiry, we were informed that appellant, then unable to pay for housing, moved into a friend's apartment, causing his friend to run the risk of eviction because the occupancy violated the friend's lease. He managed to remain there for three

Appellant had participated in the General Assistance Workfare Program since September 1990. Under *N.J.A.C.* 10:85–10.4, he was required to work three days per month. This instance of oversleeping by an hour, ostensibly due to an alarm clock malfunction, was alleged by the welfare worker to be appellant's third infraction in the nearly two years he had participated. Since the three alleged infractions had occurred in the last five months of this period, the welfare worker terminated the benefits because of what she perceived to be a changed pattern in appellant's participation in the program. One of the two prior alleged derelictions was a violation for an unknown reason on April 22, 1992, documented only by a note in the welfare file. The present welfare worker had only supervised this case since June 1992, and was unfamiliar with this first alleged violation. The second violation on June 25, 1992, was in fact excused. On that date appellant was late to work because he had to pay a parking ticket. He had reported to the job site to receive a new work assignment and the General Assistance Program Office contacted the Municipal Welfare Office for approval, which was given. The welfare worker noted, however, that there was good cause to terminate appellant's benefits for ninety days because of the August 1992 tardiness, even without the prior incidents.

One of appellant's arguments is that the Municipal Welfare Office was not the proper decision-making entity. The administrative law judge reviewed this contention in detail, and determined that local procedures had changed because of budget constraints and that the Municipal Welfare Department had been making eligibility determinations because the New Jersey Employment Service could only see the General Assistance Employment Program participants once a month. Except where a work site is considered an interim assignment for a benefit recipient, *N.J.A.C.* 10:85–10.1(b) and *N.J.A.C.* 10:85–10.7(a) appear to vest

---

months until his assistance was restored. We were not told how he procured food during this ninety-day period, since his food stamp eligibility automatically terminated when his general assistance grant was suspended.

the decision-making authority (concerning whether good cause existed for a failure or refusal to perform work) with the Employment Service, not the Municipal Welfare Department. The administrative law judge, however, gave recognition to the changed procedure delegating this decision to the Welfare Department.

Rather than base our decision on a possible technical deficiency concerning the proper decision maker in this case, we prefer to review the statutory and regulatory scheme, and rest our decision on those grounds.

General assistance is governed by *N.J.S.A.* 44:8–107 *et seq.* It is the final safety net under all other assistance programs. It is available only if the recipient is unemployable or unable to find a job. Exclusion from this program relegates the potential recipient who truly cannot find any gainful employment to private beneficence, if available, or if not, to begging on the streets. Potential recipients are permitted little or no savings, and unless they are lucky enough to have family, friends or a charitable organization willing to care for them, exclusion from this program may leave them with no viable means of support. In construing these statutes therefore we do so with an inherent refusal to believe that the policy of the State of New Jersey expressed through our Legislature and delegated to our administrators is to force such a condition, except in the most extreme cases.

Even prior to the 1991 amendments of the statute, the Legislature provided for a two-tiered system of benefits, one for those who are able-bodied and can work, and the other for the physically or mentally infirm. *See Senate Revenue, Finance and Appropriations Committee Statement* to Senate No. 3075—*L.*1977, *c.* 286 (appended to *N.J.S.A.* 44:8–108). The workfare program was embodied in *N.J.S.A.* 44:8–114, which since 1985 provided a ninety-day period of ineligibility for those who refused or failed without good cause to report for or perform assigned work. The workfare amendment effected by *L.*1985, *c.* 471, § 1, effective January 16, 1986, required a ninety-day ineligibility period be imposed upon "[a]ny person who without good cause fails or

refuses to report for or to perform work to which he has been assigned by the director of welfare or the division." The amendment further defined willingness to work as follows:

> Willingness to report for or to perform work shall be demonstrated by maintaining a current registration with the division; by reporting to a division office upon request and providing all required information; by reporting for employment interviews as scheduled by the division; by accepting employment or better employment when offered, whether or not the offer is made through or referred by the division; by accepting training for employment as offered when the person is unemployed; and by continuing in employment training, unless the person has good cause to fail or refuse to report for or to perform the work to which the person has been assigned.

The statute already defined good cause; the 1985 act only effecting a minor amendment:

> Good cause for failure or refusal to report for or to perform work shall include, but shall not be limited to: working conditions which are a substantial risk to health and safety; physical inability to engage in a particular type of work; or lack of a reasonable means of transportation.

All of these provisions were repealed by L.1991, c. 523, § 14, initially effective July 1, 1991, but postponed until July 1, 1992 when the Family Assistance Program superseded the prior workfare program. Before we define the effects of the repealer, however, we will first delve into the regulations adopted to implement the quoted provisions of the statute.[2] We reiterate, however, that we are looking at the regulations that interpret the statute providing the final safety net before relegating the potential recipient to the streets.

N.J.A.C. 10:85–3.2(g)5 provides that where the employment service is unable to locate immediate employment, an employable recipient is to be assigned to a work project. Persons who fail or refuse to perform are subject to the penalty of ninety days termination of benefits.

The Legislature determined that good cause for failure or refusal to report for or to perform work "*shall include, but shall*

---

[2] The Commissioner was authorized to promulgate regulations pursuant to N.J.S.A. 44:8–111(d).

*not be limited to*" the enumerated causes. The Commissioner added four other acceptable causes, but adopted the regulation excluding the language that good cause would include but not be limited to the list. In *N.J.A.C.* 10:85–3.2(g)6, the Commissioner added that good cause would additionally include the lack of a bona fide offer of employment; an offer at less than the applicable minimum wage established by law; a job available solely because of a strike or walk out, and a job requiring membership in a union which the recipient did not wish to join. The legislatively dictated reasons of physical inability, lack of transportation or hazardous working conditions remained on the list. Under a strict reading of the regulation, as interpreted by the welfare worker and upheld administratively, any other basis for not reporting to the job apparently failed the "good cause" test, and pursuant to *N.J.A.C.* 10:85–3.2(g)7, mandated a determination that the recipient was "unwilling to work." This would in turn require imposition of the penalty of *N.J.A.C.* 10:85–3.2(g)7ii(1), a ninety-day termination of benefits. Thus, for example, attending a family funeral, caring for a sick or aged parent, responding to a court subpoena, becoming lost trying to find the work site, or even having a faulty alarm and showing up an hour late, *ipso facto* indicates an unwillingness to work and requires a ninety-day suspension of payments.[3]

Appellant was given $140 per month and was required to work three days a month, thus receiving $46.67 a day for his labors. Assuming an eight-hour day, he was receiving $5.83 per hour for physical labor aboard a recycling truck. According to the State, if after two excused absences in a two year period he showed up an hour late, he forfeited his benefits for three months because he was deemed to be unwilling to work. We recognize that the program administrators must keep control over their workers,

---

[3] The State may argue that, as revealed by plaintiff's record, suspension is not immediate, and that other excuses are accepted. We would hope so. But we also note that the welfare worker opined that the prior instances were unnecessary to the decision and that the termination here under review could have been imposed solely for the single infraction.

both to run the program and to inculcate work habits in the participants. In this case, however, if plaintiff was actually unwilling to work, why, having overslept, did he show up at all? If he was unwilling to work, why did he immediately seek a new date? When the Legislature stated that good cause for failure or refusal to report for work shall include but not be limited to unsafe working conditions, physical inability or lack of transportation, did it envision that being late by one hour because of a faulty alarm clock, coupled with an effort to obtain a new work assignment, would cause a ninety-day termination of the benefits that are intended to be the recipient's last social safety net? We think not.

■ Either the regulation is facially invalid because it permits no other reasonable exceptions or reduced penalties, or it must be read as incorporating the Legislature's language of including but not being limited to the enumerated reasons. Rather than invalidate the regulation, we prefer to construe the regulation as including the power to relax it in other appropriate cases. This interpretation strikes us as the most sensible and the most consistent with the legislative purpose. *Cf. Midlantic Nat'l Bank v. The Peerless Ins. Co.*, 253 *N.J.Super.* 137, 142, 601 *A*.2d 243 (App.Div.1992). We therefore reverse the determination terminating appellant's benefits.

There is another basis upon which we could have reversed this termination, but again we must do some judicial surgery in order to save the workfare program in those counties in which the Family Development Initiative is not yet effective. *See N.J.S.A.* 44:10–19 *et seq.* When *N.J.S.A.* 44:8–114 was amended, the workfare provisions were repealed. It was these provisions, however, that authorized all of the regulations governing workfare, and under which appellant's benefits were terminated. Thus, technically, on the date the appellant's benefits were terminated, there was no authority for the entire workfare program including the regulations. If the Family Development Initiative Program were effective throughout the State, we could understand that the Legislature had substituted that program for workfare. However,

the Family Development Initiative Program is subject to a phase-in. From July 1, 1992 through September 21, 1992 the new program was not implemented in any county. As of September 21, 1992, the program entered its initial phase only for Camden, Essex and Hudson Counties. There was no such program in Passaic County when the events leading to appellant's termination occurred.

We could interpret the Family Development Initiative as terminating the workfare program, thus entitling all workfare participants to their benefits without the necessity of performing service. We cannot, however, attribute such an intention to the Legislature. While the statute technically may have been repealed, the Assembly Health and Human Services Committee Statement filed with Assembly No. 4700—*L.*1991, *c.* 523, (reprinted following *N.J.S.A.* 44:10–19, the first section of the "Family Development Act") indicates that the Legislature intended that the program would first be established in the three counties and that "other counties will be phased in during a subsequent two-year period." While there was no mention of the effect of the amendments on the workfare program, the whole concept of the Family Development Initiative Program, with its emphasis on worker training within the broader concept of family development, appears to be a replacement for the individual-centered workfare program. But we do not believe that the Legislature intended to terminate the workfare program until the Family Development Program became effective on a county-by-county basis.

We note that the amendment to *N.J.S.A.* 44:8–114 specifically changes the penalties for those who fail or refuse to enroll and participate in the Family Development Initiative Program. Now the Legislature directs that the benefits should be reduced by at least twenty percent, or that the recipient should be ineligible for public assistance for a period of at least ninety days, thus ameliorating the more stringent workfare penalties by providing an alternative of reduction of benefits (although no ceiling is set for either the percentage reduction or length of suspension). Given

the change in the law, the Commissioner should promulgate transition regulations for the workfare program granting an additional measure of discretion as noted in this opinion. The Legislature also might consider retroactively and specifically saving the former *N.J.S.A.* 44:8–114 from repeal, pending the full implementation of the Family Development Initiative Program.

In the interim, to give flexibility in the administration of the workfare program we will deem the current twenty percent and ninety-day penalty authorization as being effective in the workfare program as well as the Family Development Initiative Program. On remand, therefore, if the Director deems that a penalty still must be assessed, a reduced payment option is available. We do not by this statement, however, wish to imply that there should be such a payment reduction, or in fact any penalty at all.

The administrative order denying appellant three months benefits totalling $420 is reversed, and this matter is remanded to the Director of the Division of Family Development for further action as provided in this opinion.